[No. A036661. First Dist., Div. Four. Mar. 30, 1988.]

EVELYN MULLEN et al., Plaintiffs and Appellants, v.
ARMSTRONG WORLD INDUSTRIES, INC., et al., Defendants and
Respondents.

**[Opinion certified for partial publication.¹]**

¹ Part II (only) is not published, as it does not meet the standards for publication contained in rule 976(b), California Rules of Court.

## COUNSEL

A. Curtis Sawyer, Jr., Jarvis, Miller, Brodsky & Baskin, Hugh B. Miller, Eugene A. Brodsky, Barrett R. Baskin and Mark F. Anderson for Plaintiffs and Appellants.

William Bates III, McCutchen, Doyle, Brown & Enersen, James Balich, Morgenstein & Jubelirer, John B. Bates, Jr., Cooley, Godward, Castro, Huddleson & Tatum, Richard Sanford, Michael Singer, Gudmundson, Siggins & Stone, Edith Kelly Politis, Stark, Wells, Rahl, Field & Schwartz, Evanthia Spanos, Barbara Silver, Berry & Berry, Ruppert H. Ricksen, Knox, Ricksen, Snook, Anthony & Robbins, Mark H. Rosenthal, Philip B. Bass, Titchell, Maltzman, Mark, Bass, Ohleyer & Mishel, Patrick J. Cafferty, Aaron D. Adler, Landels, Ripley & Diamond, Robert S. Daggett, Lawrence S. Bazel, Brobeck, Phleger & Harrison, Brian W. Aherne, Melinda W. Ebelhar, LaFollette, Johnson, DeHass & Fesler, Kevin C. Maynard, Marron, Reid & Sheehy, Linda A. Wayne, Archer, McComas & Lageson, Kenneth B. Prindle, Schell & Delamer, Patrick J. Hagan, Kincaid, Gianunzio, Caudle & Hubert, Timothy Cederborg, Mullally & Cederborg, Richard H. Borow, Henry Shields, Jr., Susan M. Cayer, Irell & Manella, Franklin Bondonno, Popelka, Allard, McCowan & Jones, Ned N.

Isokawa, Crosby, Heafey, Roach & May, Richard S. Bishop, Bishop, Barry, Howe & Reid, David J. Armstrong, Dickie, McCamey & Chilcote, Charles Negley, Douglas G. Wah, Susan Watson, Fisher & Hurst, Kenneth B. Prindle, Schell & Delamer, Paul J. Matzger, Leland, Parachini, Steinberg, Flinn, Matzger & Melnick, William D. Connell, Gibson, Dunn & Crutcher, Kevin C. Maynard, Marron, Reid & Sheehy, Kenneth B. Wright, Anthony Russo, Nancy L. Mayfield, Morgan, Lewis & Bockius, Richard L. Reynolds, Bennett, Samuelsen, Reynolds & Allard, Thomas W. Kemp, Washburn & Kemp, Shepard M. Remis, Stephen E. Neel and Goodwin, Proctor & Hoar for Defendants and Respondents.

## OPINION

**POCHÉ, J.**—This appeal is from a judgment dismissing an amended complaint entered following the sustaining of a general demurrer without leave to amend. The question presented is whether a cause of action has been stated according to the "market share" theory of liability adopted in *Sindell* v. *Abbott Laboratories* (1980) 26 Cal.3d 588 [163 Cal.Rptr. 132, 607 P.2d 924, 2 A.L.R.4th 1061], for the removal of asbestos products from residential housing throughout the state. We hold that no such cause of action has been alleged.

### BACKGROUND

Measured against the familiar rules governing our review (see *Sklar* v. *Franchise Tax Board* (1986) 185 Cal.App.3d 616, 621 [230 Cal.Rptr. 42]), these are the salient allegations of the amended complaint:

Plaintiffs Evelyn Mullen, Robert Doherty, and John M. Korn are the owners of homes located in San Francisco, Marin, and Contra Costa counties, respectively. On behalf of a class consisting of all natural persons who own "homes" built from 1912 through 1978 which contain "friable asbestos, friable asbestos materials, or friable asbestos-containing products mined, manufactured, sold or distributed by defendants," they commenced this action against more than 40 companies "which have been and/or are now engaged in the mining, manufacturing or supplying of friable asbestos, friable-asbestos containing materials, or friable asbestos-containing products."[2]

---

[2] Plaintiffs defined these terms as follows: "In this complaint, 'friable asbestos', 'friable asbestos-containing material', and 'friable asbestos-containing products' mean any asbestos-containing material applied onto ceilings, walls, structural members, piping, ductwork, or any other part of the building structure which, when dry, may be crumbled, pulverized,

Plaintiffs alleged that "asbestos is a known human carcinogen" and causative agent for numerous other ailments. When it deteriorates into the "friable" condition, "asbestos in homes results in the present and continuing contamination of persons and property as well as creating a serious risk of harm to persons . . . as well as . . . rendering plaintiffs' property unsafe and unreasonably dangerous." "Asbestos is but a single ingredient in various insulation, fireproofing and decorative materials applied in plaintiffs' homes. Asbestos has contaminated, among other things, the remainder of the insulator fireproofing and decorative materials, the curtains, drapes, walls, floors, carpets, ceilings, furniture, clothing and food of the occupants of the homes. . . . Asbestos cannot be effectively removed from said materials and . . . ordinary cleaning merely . . . worsens the contamination." These conditions have significantly reduced the value of plaintiffs' homes.

Plaintiffs further alleged that defendants knew of these dangers but intentionally suppressed public disclosure, failed to label their products, and failed to warn of the dangers "on the relationship between asbestos exposure and disease" when asbestos products were "placed into the stream of commerce." In addition, "[t]he asbestos products of [some of] the defendants were functionally interchangeable with the asbestos products of the remaining defendants" and "[t]here are no adequate testing or sampling procedures available to identify which defendant made a particular asbestos-containing product." It would for these reasons "be impossible for plaintiffs and the class to identify which of the defendants is responsible for the mining, milling, fabricating, manufacturing or selling of the friable asbestos or materials and the asbestos-containing products used in their homes."[3] "The present harm and threat to health and safety posed by friable asbestos, friable asbestos materials, and friable asbestos-containing products does not vary significantly as between such asbestos materials or products produced by the different defendants. The materials and products are fungible in this regard, among others."

Based upon these allegations, plaintiffs purported to state causes of action for negligence, strict liability, nuisance, breach of implied warranty, civil conspiracy, "failure to warn," and "concert of action." The primary feature

reduced to powder by hand pressure, or blown into the air by forced air circulation, or which is otherwise easily damaged and circulated into the air by foreseeable activities.

"In this complaint, 'houses' or 'homes' mean real properties intended for habitation by four families or less, including mobile homes and condominiums . . . ."

Plaintiffs refrained from naming certain specified firms "as defendants although they are also responsible for plaintiffs' damages since those corporations have filed bankruptcy proceedings."

[3] This allegation differs from plaintiffs' original complaint, wherein they alleged: "*With rare exceptions,* it would be impossible to identify the defendant or defendants responsible for the mining, milling, fabricating, manufacturing or selling of the friable asbestos or materials or the asbestos-containing products used in particular homes." (Italics added.)

of plaintiffs' prayer was their request for "recovery of the general and special compensatory damages for the costs of inspection, estimation of damages, analysis, containment, removal, replacement, and abatement of friable asbestos-containing materials and friable asbestos-containing products in plaintiffs' homes and to pay for alternative living accommodations while their homes are being repaired and the asbestos abated (their homes being uninhabitable and dangerous during such repair and abatement work) in an amount to be determined, but estimated to be in excess of $1,000,000,000."[4] They also sought prejudgment interest, exemplary damages in an undetermined amount, attorneys' fees, costs, and general relief.

A salvo of general demurrers were interposed to each count of the amended complaint.[5] A common theme developed by defendants was that their respective products were capable of being individually identified, thus defeating application of the *Sindell* approach. After conducting extensive hearings on the demurrers, the trial court sustained them without leave to amend. A judgment of dismissal ensued which is the subject of this timely appeal.

REVIEW

I

*Sindell* v. *Abbott Laboratories* involved a class action by women who developed or were likely to develop cancer caused by their mothers' prenatal ingestion of the drug diethylstilbesterol (DES). Their complaint was dismissed after the manufacturers successfully demurred on the ground that the plaintiffs could not identify which of the manufacturers had produced the DES administered to each plaintiff's mother. The Supreme Court reversed the judgment of dismissal. The essential holding of *Sindell* has been summarized in these terms: "[T]he likelihood that any one of several manufacturers of a generic drug, marketed and promoted for a use which proved to produce harmful effects in the yet unborn daughters of the women to whom it was administered, supplied the product that allegedly injured the plaintiff[s] may be measured by the percentage which the product sold by each such manufacturer bears to the entire production of the drug sold by

---

[4] Respondent Kaiser Cement Corporation estimates that plaintiffs' claims for the entire class could reach almost $42,000,000,000.

[5] Demurrers to plaintiffs' original complaint were sustained with leave granted to amend.

In connection with the demurrers to the amended complaint, both sides made contested requests that the trial court take judicial notice of various court records and publications. (See Code Civ. Proc., §§ 430.30, 430.70; Evid. Code, §§ 452-453.) The court granted defendants' request in full and plaintiffs' request in part. Further requests for judicial notice of additional materials were granted by this court during the pendency of this appeal. Certain of the matters noticed by both courts will figure in our resolution of the appeal.

all for that purpose." (*Sheffield* v. *Eli Lilly & Co.* (1983) 144 Cal.App.3d 583, 593 [192 Cal.Rptr. 870].)[6]

One of the predicates for *Sindell* liability is the absence of discernible distinguishing features or characerics of the instrumentalities produced by the industry defendants. The court took pains to establish that it was dealing with "fungible goods"—specifically, a drug produced "from an identical formula." (*Sindell* v. *Abbott Laboratories, supra,* 26 Cal.3d 588 at pp. 610-611.) ▪▪▪ Plaintiffs' argument that market share liability should be extended from the DES field of *Sindell* to the asbestos industry proceeds on the premise that DES and asbestos are simple equivalents. This is far from being the case.

▪▪▪ "The word 'asbestos' is derived from the Greek word meaning 'inextinguishable' and the origin of its name reflects one of its principal characteristics: fire resistance. But asbestos has many other qualities which enhance its commercial utility, among them tensile strength, durability, flexibility, and resistance to heat, wear, and corrosion." (1 Rep. of the Royal Com. on Matters of Health and Safety Arising from the Use of Asbestos in Ontario (1984) 75 [fn. omitted].) "Over 3,000 separate uses of asbestos have been identified . . . . [T]hese uses depend principally upon the physical and chemical properties of asbestos fibres and the particular characteristics of individual fibre types." (*Id.* at p. 89.) It has figured in commercial production for more than a century. (See *Borel* v. *Fibreboard Paper Products Corporation* (5th Cir. 1973) 493 F.2d 1076, 1083, fn. 3.)

▪▪▪ The briefest consideration demonstrates numerous inherent differences between DES and asbestos. We quote from the Florida Supreme Court's treatment of this problem: "DES was produced by hundreds of companies *pursuant to one formula.* As a result, all DES had identical

---

[6] "Describing the theory of market share liability is much easier than defining it:

" 'Under this doctrine, the traditional prerequisite of identifying the manufacturer of the injury-causing product is eliminated when the product is a generic item produced by several manufacturers. In such cases, plaintiffs need only allege inability to identify the actual manufacturer and join as defendants those manufacturers that compose a "substantial share" of the market. Plaintiffs then proceed with their case against those members of the industry that are named as defendants. This theory shifts the burden of proof to each manufacturer to prove its innocence . . . .

" 'If, after proceeding against the industry in this manner, plaintiff successfully establishes liability, damages are simply apportioned among defendants on the basis of each defendant's share of the product market. The resultant market share liability imposed thus "approximate[s each manufacturer's] responsibility for the injuries caused by its own products." A defendant can avoid liability only by proving that it did not produce the specific product that harmed the plaintiff.' " (*Hannon* v. *Waterman S.S. Corp.* (E.D.La. 1983) 567 F.Supp. 90, 91, fn. 1 [citing and quoting Note, *Market Share Liability for Defective Products: An Ill-Advised Remedy for the Problem of Identification* (1981) 76 Nw. U. L.Rev. 300, 301-302].)

physical properties and chemical compositions and, consequently, all DES prescribed to pregnant women created the same risk of harm . . . .

"Asbestos products, on the other hand, have widely divergent toxicities, with some asbestos products presenting a much greater risk of harm than others. [Citations.] This divergence is caused by a combination of factors, including: the specific type of asbestos fiber incorporated into the product; the physical properties of the product itself; and the percentage of asbestos used in the product. There are six different asbestos silicates used in industrial applications and each presents a distinct degree of toxicity in accordance with the shape and aerodynamics of the individual fibers. Further, it has been established that the geographical origin of the mineral can affect the substance's harmful effects. A product's toxicity is also related to whether the product is in the form of a solid block or a loosely packed insulating blanket and to the amount of dust a product generates. The product's form determines the ability of the asbestos fibers to become airborne and, hence, to be inhaled or ingested. The greater the product's susceptibility to produce airborne fibers, the greater the product's potential to produce disease. Finally, those products with high concentrations of asbestos fibers have corresponding high potentials for inducing asbestos-related injuries." (*Celotex Corp.* v. *Copeland* (Fla. 1985) 471 So.2d 533, 537-538; accord *Vigiolto* v. *Johns-Manville Corp.* (W.D.Pa. 1986) 643 F.Supp. 1454, 1463.)

*Sindell* involved a group of 11 defendants all "engaged in the business of manufacturing, promoting, and marketing" a single product "produced . . . from an identical formula." (*Sindell* v. *Abbott Laboratories, supra,* 26 Cal.3d 588 at pp. 593, 611.) By contrast, asbestos is a generic designation possessing a rainbow-like diversity and a bewildering array of potential uses.[7] The scope of plaintiffs' complaint is not quite so broad, but it does

---

[7] " 'The asbestos family consists of more than 30 different minerals of fibrous structure. The minerals' physical properties vary so that only six varieties are of substantial economic value. These six minerals are chrysotile, crocidolite, amosite, anthophyllite, tremolite, and actinolite. Chrysotile, known for its silky white color, its durability, and its flexibility, is the most widely used asbestos fiber. Manufacturers use it in the production of asbestos textiles, cement products, friction materials, insulation, and paper products. It is the least dangerous of the economically useful fibers. Crocidolite, a harsher, blue fiber, is used in pipes, cement products, textiles, and felts for plastics. Crocidolite, which is resistant to acids and alkalides, is more difficult to process than many of the other fibers and is the most dangerous of the asbestos fibers. Amosite is a harsh, brown fiber. It is extremely heat resistant, and manufacturers use it in cement, pipes, refractory tiles, and plastic reinforcement. It is a moderately dangerous fiber. Anthophyllite is used in cement production and the chemical industry. Tremolite is used for *talc filters and in the chemical industry. Actinolite usually is not used commercially. . . .*
" '.     .     .     .     .     .     .     .     .     .     .     .     .     .     .

reach "various insulation, fireproofing and decorative materials applied in plaintiffs' homes." Such diverse products are obviously not "produced . . . from an identical formula." The activities of our defendants are likewise correspondingly greater than those of the defendants in *Sindell*: the more than 40 defendants named by plaintiffs are identified as having "mined, milled, . . . designed, manufactured, developed, fabricated, assembled, labeled, advertised, marketed, sold, distributed, supplied, installed, and/or applied" asbestos in various forms. In addition, market share liability was formulated in the singular situation of *Sindell* where the injured parties attacked "a product which carried with it a singular risk factor." (*Case* v. *Fibreboard Corp., supra,* 743 P.2d 1062 at p. 1066; see *Sindell* v. *Abbott Laboratories, supra,* 26 Cal.3d 588 at pp. 611-612.) By contrast, plaintiffs here seek recovery for damage to their persons and their property. Because "asbestos is not a 'product,' but rather a generic name for a family of minerals" (*Goldman* v. *Johns-Manville Sales Corp.* (1987) 33 Ohio St.3d 40 [514 N.E.2d 691, 700]) employed in a myriad of uses, the unavoidable conclusion is that plaintiffs are attacking an entire industry, not seeking recovery for damages caused by a single fungible product "carr[y]ing with it a singular risk factor." In light of these circumstances, the prerequisite of fungibility has not been demonstrated. Plaintiffs have therefore failed to state a cause of action for market share liability. We thus align California, the progenitor of the market share theory of liability, with the great majority of jurisdictions which have declined to extend it to the field of asbestos-related injuries. (See *In re Related Asbestos Cases* (N.D.Cal. 1982) 543 F.Supp. 1152; *In re Asbestos Litigation* (Del.Super. 1986) 509 A.2d 1116; *Blackston* v. *Shook & Fletcher Insulation Co.* (11th Cir. 1985) 764 F.2d 1480 [applying Georgia law]; *Starling* v. *Seaboard Coast Line R. Co.*

---

" 'Primary uses of asbestos include floor tile; gaskets and packing; friction products; paints; coatings; sealants; plastics; asbestos-cement pipe; asbestos textiles; asbestos paper; and asbestos-cement sheet.

" 'Secondary uses of asbestos include flooring; valve, flange, and pump sealants; clutch, transmission, and brake components; industrial friction materials; automobile coatings; roof coating and patch; electric motor components; piping; conduits for electric wires; packaging components; gasket components; heat and fireproof clothing; insulation for wiring; theater curtains; fireproof drapery; table pads and heat protective mats; molten glass handling equipment; insulation products; filters for beverages; appliance insulation; hood vents for corrosive materials; electric switchboards; miscellaneous building materials; appliance components; and cooling tower components.

" 'Consumer uses include piping; decorative building panels; plaster and stucco; molded plastics; acoustical products; asphalt paving; caulking; motor armatures; paints; welding materials; drip cloths; fire doors; car components; oven and stove insulation; siding; shingles; floor tiles; chemical tanks; fire hoses; garments; gloves; filter media; boiler insulation; furniture; motion picture screens; roofing; rugs; wallboard; acoustical ceiling materials; insulation; electrical switches; hair dryers; clothes dryers; toasters; humidifiers; and toothbrushes.' " (*Case* v. *Fibreboard Corp.* (Okla. 1987) 743 P.2d 1062, 1065-1066 [citing and quoting *An Analysis of the Legal, Social, and Political Issues Raised by Asbestos Litigation* (1983) 36 Vand. L.Rev. 573, 578-579, fns. 1 and 7].)

(S.D.Ga. 1982) 533 F.Supp. 183; *Bateman* v. *Johns-Manville Sales Corp.* (5th Cir. 1986) 781 F.2d 1132 [applying Louisiana law]; *Tidler* v. *Eli Lilly and Co.* (D.C.D.C. 1982) 95 F.R.D. 332 [reference to unreported decisions where district courts applying Maryland law rejected application of market share theory to asbestos-related claims]; *Marshall* v. *Celotex Corp.* (E.D.Mich. 1987) 651 F.Supp. 389; *Goldman* v. *Johns-Manville Sales Corp., supra,* 33 Ohio St.3d 40 [514 N.E.2d 691]; *Case* v. *Fibreboard Corp., supra,* 743 P.2d 1062; *Vigiolto* v. *Johns-Manville Corp., supra,* 643 F.Supp. 1454; but see *Menne* v. *Celotex Corp.* (D.Kan. 1986) 641 F.Supp. 1429 [applying Nebraska law to find market share liability].)[8]

II[9]

. . . . . . . . . . . . . . . . . . . .

The judgment of dismissal is affirmed.

Anderson, P. J., and Channell, J., concurred.

---

[8] Equally worthy of mention is the March 1985 ruling by Judge (now Justice) John E. Benson that the *Sindell* market share theory should not be applied to thousands of personal injury actions against asbestos manufacturers. (In re: Complex Asbestos Litigation, San Francisco Super.Ct. Action No. 828-684 [General Order No. 21, filed Mar. 13, 1985].)

Defendants also argue that the number and diversity of uses to which asbestos has been employed makes it impossible to identify the "relevant market" as contemplated by *Sindell.* The court in *Sindell* expressly noted that it was "not unmindful of the practical problems involved in defining the market and determining market share, but these are largely matters of proof which properly cannot be determined at the pleading stage . . . ." (*Sindell* v. *Abbott Laboratories, supra,* 26 Cal.3d 588 at p. 613 [fn. omitted].) Counsel have informed us that several asbestos manufacturers—including the industry's largest, Johns-Manville—are currently involved in bankruptcy proceedings. (See *Jackson* v. *Johns-Manville Sales Corp.* (5th Cir. 1985) 750 F.2d 1314, 1336.) Although we agree that the absence of these firms would aggravate considerably the difficulty or even feasibility of ascertaining the market shares of the firms dealing with asbestos which have been joined as defendants in this action (see *Goldman* v. *Johns-Manville Sales Corp., supra,* 514 N.E.2d 691 at p. 701; *Hannon* v. *Waterman S.S. Corp., supra,* 567 F.Supp. 90 at p. 92), we deem it prudent to follow the Supreme Court's lead and avoid either discussing this issue or resting a disposition of this "pleading stage" case upon it.

[9] See footnote 1, *ante.*