[Nos. A056799, A058407. First Dist., Div. Four. Feb. 9, 1994.]

LYNN RICHIE, Individually and as Special Administrator, etc., Plaintiff and Appellant, v.
BRIDGESTONE/FIRESTONE, INC., et al., Defendants and Respondents.

**[Opinion certified for partial publication.\*]**

* Part IV of this opinion is not certified for publication. (See Cal. Rules of Court, rules 976(b) and 976.1.)

**COUNSEL**

Cartwright, Slobodin, Bokelman, Borowsky, Wartnick, Moore & Harris, Harry F. Wartnick, Steven M. Harowitz and Daniel U. Smith for Plaintiff and Appellant.

Ericksen, Arbuthnot, Brown, Kilduff & Day, William G. Hoback, Pamela R. Peters, Stevens, Drummond & Gifford, David A. Gifford, M. Elisabeth Gifford, Kincaid, Gianunzio, Caudle & Hubert, Patrick J. Hagan, Edward E. Hartley and James R. Colgan for Defendants and Respondents.

**OPINION**

**REARDON, J.**—On plaintiffs Michael and Lynn Richie's[1] action for personal injuries, the trial court entered judgments for defendants Bridgestone/Firestone, Inc., Wagner Electric Corporation and Kaiser Gypsum Company, Inc. The trial court also awarded sanctions to Bridgestone and Wagner. In consolidated appeals from the judgments and the sanctions order, appellant Lynn Richie contends that (1) the nonsuits granted to Wagner and Bridgestone/Firestone are no longer valid after our decision in *Wheeler* v. *Raybestos Manhattan* (1992) 8 Cal.App.4th 1152 [11 Cal.Rptr.2d 109] (*Wheeler*); (2) the sanctions order should be reversed; and (3) the trial court erred by

---

[1]The initial complaint was filed in 1991 on behalf of Michael Richie and his wife, Lynn. Since Michael's death in 1992, Lynn Richie acts individually and as special administrator of Michael Richie's estate in these appeals.

granting Kaiser Gypsum's motion for directed verdict. We agree that *Wheeler* applies retroactively and so reverse the judgments for Bridgestone/ Firestone and Wagner, as well as the related sanctions order, and remand these matters to the trial court. We affirm the judgment entered after Kaiser Gypsum's directed verdict.

## I. FACTS[2]

Michael Richie worked as a mechanic and a carpenter for various employers from 1966 to 1968 and from 1971 to 1991. He later contracted asbestosis. In June 1991, Michael Richie and appellant Lynn Richie filed an action against numerous asbestos defendants, alleging causes of action for negligence, strict liability, enterprise liability, false representation and loss of consortium. They sought compensatory and punitive damages. Respondents Bridgestone/Firestone, Inc., Wagner Electric Corporation and Kaiser Gypsum Company, Inc., were named as defendants. Bridgestone/Firestone and Wagner manufactured brake products containing asbestos; Kaiser Gypsum manufactured a ceiling spray containing asbestos.

Wagner demurred to the enterprise liability cause of action. In August 1991, the Richies and Wagner entered into a court-approved stipulation that this cause of action was premised on a market share theory of liability; that San Francisco Superior Court General Order No. 21 had determined that this theory was inapplicable to asbestos litigation; and that the demurrer would be sustained without leave to amend. The stipulation stated that the Richies retained the right to assert their entitlement to proceed on a market share theory of liability on appeal.

Before trial, Wagner moved to exclude any reference in the opening statement to market share liability theory. The Richies stated their understanding that general order No. 21 precluded them from proceeding on this theory. Their counsel stated: "I'm not intending to put on the market share theory case. . . . [¶] . . . [W]e're not going to just say 'well, they have such percentage of the market and therefore, Mr. Richie must have been exposed.' That's not the intention of our case." The trial court granted the motion, precluding the Richies from arguing a market share theory.

In December 1991 trial began. After the Richies gave their opening statement, Wagner and Bridgestone/Firestone moved for nonsuit, arguing

---

[2]When a nonsuit is granted after an opening statement, we assume that the plaintiff could prove all favorable facts alleged. (*Wheeler, supra,* 8 Cal.App.4th at p. 1154.) A motion for a directed verdict is likewise a demurrer to the evidence. (*Hilliard* v. *A. H. Robins Co.* (1983) 148 Cal.App.3d 374, 394 [196 Cal.Rptr. 117].) Thus, our statement of facts assumes Richie's facts are true.

that the Richies had no evidence of exposure to their products and thus, no evidence of causation. The Richies countered that they stated all that they were required to state—that Michael Richie was exposed to asbestos emanating from brake products manufactured by Wagner and Bridgestone/Firestone—and that inferential evidence would allow the case to go to the jury. The Richies' counsel stated: "I'm not attempting to use a market share theory." The motions were granted and judgments in favor of Wagner and Bridgestone/Firestone were entered. Lynn Richie appeals these judgments. (Case No. A056799.)

Bridgestone/Firestone also moved for sanctions against the Richies on the ground that they proceeded to trial without evidence of causation. Wagner joined in this motion. In July 1992, the motions were granted; Wagner was awarded $19,975.50 and Bridgestone/Firestone was awarded $23,701.50. Lynn Richie appeals this order. (Case No. A058407.)

In the meantime, the Richies' case went to trial against Kaiser Gypsum. After presentation of evidence, Kaiser Gypsum[3] moved for a directed verdict. The motion was taken under submission. The jury deliberated on the case, but was unable to reach a verdict and a mistrial was granted. Then, the trial court granted the motion for directed verdict and judgment was entered dismissing the action against Kaiser Gypsum. The Richies moved for a new trial, challenging Kaiser Gypsum's directed verdict, without success. Lynn Richie appeals the judgment. (Case No. A056799.)

## II. NONSUITS

■ First, Richie argues that nonsuits granted to Bridgestone/Firestone and Wagner are invalid after *Wheeler*, *supra*, 8 Cal.App.4th 1152, applied the market share theory of liability to asbestos cases pursued against brake manufacturers. Under the market share theory of liability, a plaintiff harmed by a fungible product that cannot be traced to a specific producer may sue various makers of the product if the plaintiff joins a substantial share of those makers as defendants. Last year, we held that the market share theory of liability may be used when a plaintiff has been exposed to asbestos fibers in brake pads. (See *Wheeler*, *supra*, 8 Cal.App.4th at pp. 1155-1158.) Our decision in *Wheeler* became final after Richie perfected her appeals challenging the brake defendant judgments and the sanctions order.

Richie urges us to apply *Wheeler* retroactively. Generally, judicial decisions are given retroactive effect. California courts consistently apply tort

[3]Kaiser Gypsum filed three petitions for writs of mandate and stays in January 1992 to quash three subpenas duces tecum. (Case Nos. A056142, A056143, A056144.) All three petitions were denied.

decisions retroactively even when those decisions declare new causes of action or expand the scope of existing torts in ways that defendants could not have anticipated before the decision was handed down. (*Newman* v. *Emerson Radio Corp.* (1989) 48 Cal.3d 973, 978, 981-982 [258 Cal.Rptr. 592, 772 P.2d 1059].) Having considered these general principles, we conclude that our decision in *Wheeler* applies retroactively.

Nevertheless, Bridgestone/Firestone and Wagner argue that *Wheeler* should not be retroactively applied in this case for various reasons. First, Wagner correctly argues that the only cause of action on which the market share theory of liability applies is the enterprise liability cause of action, to which a demurrer was sustained. Only the enterprise liability cause of action is revived with the retroactive application of *Wheeler*. As to the other causes of action, the trial court properly granted the motion for nonsuit. The remaining causes of action are no more viable after *Wheeler* than they were before it was decided.

Next, Wagner argues that the Richies did not challenge the order sustaining the demurrer to the enterprise liability cause of action in their opening brief and thus, have abandoned their right to urge application of the market share theory to the enterprise liability cause of action. Richie properly appealed from the judgments, not the orders granting nonsuit or sustaining the demurrer. Wagner stipulated in the agreement to sustain the demurrer that the Richies retained the right to assert their entitlement to proceed on a market share theory of liability on appeal. It is not prejudiced by our decision to reverse the judgment—not the orders granting nonsuit—to allow the Richies to present evidence of market share liability. In light of our ruling in *Wheeler* and our finding that this ruling applies retroactively to the Richies' case, the order sustaining the demurrer no longer has the legal effect of precluding the Richies from going forward on the enterprise liability cause of action.

Both Bridgestone/Firestone and Wagner argue that the Richies failed to make an offer of proof of their market share evidence. A defendant may move for nonsuit at the close of the plaintiff's opening statement. (Code Civ. Proc., § 581c, subd. (a).) The opening statement is deemed to be an offer of proof. In *Wheeler*, the plaintiff made an offer of proof in lieu of an opening statement. (See *Wheeler*, *supra*, 8 Cal.App.4th at p. 1154.) The Richies made an opening statement, but were precluded from making the very offer of proof that Wagner now argues that they should have made. At the time that the opening statement was made, evidence of market share liability was inadmissible under general order No. 21. The trial court's order granting Wagner's motion *in limine* also precluded the Richies from arguing on the basis of this evidence in their opening statement.

Finally, Wagner urges that the Richies affirmatively waived their right to present market share theory evidence. Again, this argument ignores the obvious—that, under the state of the law at the time that these statements were made, the Richies were legally precluded from presenting evidence of market share theory. Richie cannot be found to have waived a legal theory that was not recognized until after she perfected her appeal. (See *Blair* v. *Pitchess* (1971) 5 Cal.3d 258, 274 [96 Cal.Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206] [waiver as relinquishment of known right]; *Cummings* v. *Morez* (1974) 42 Cal.App.3d 66, 74 [116 Cal.Rptr. 586] [if issue raised in trial court before decisional law permitted this argument, trial court would have had to reject it].)

As in *Wheeler*, Richie has not proven the elements of a market share case, only the right to be allowed to attempt to prove it. (See *Wheeler, supra*, 8 Cal.App.4th at p. 1158.) While the nonsuits were properly granted as to the remaining causes of action, with the retroactive application of *Wheeler*, the motions for nonsuit should have been denied on the enterprise liability cause of action. The judgments are reversed and the matter remanded to the trial court to allow Richie an opportunity to try this cause of action.[4]

## III.  SANCTIONS ORDER

Next, Richie contends that the sanctions order in favor of Bridgestone/Firestone and Wagner should also be reversed. The motions for sanctions were urged to punish the Richies for pursuing their case without sufficient evidence of causation. At that time, general order No. 21 precluded the Richies from introducing market share evidence of causation. After *Wheeler*, that evidence is admissible against these brake defendants, despite general order No. 21, on the enterprise liability cause of action.

However, the trial court's order merely imposes sanctions—it does not explain the court's reasons for doing so. If sanctions were imposed solely because the Richies pursued the market share theory of liability, the order would be invalid. If sanctions were imposed for some other reason, this

---

[4]Our dissenting colleague, who was not a member of the panel that decided *Wheeler*, declines to join the majority herein because he disagrees with the *Wheeler* decision for the reasons set forth in his dissent. We simply observe, respectfully, that no challenge to *Wheeler* has been made by any of the parties on this appeal. In fact, the parties have specifically and expressly disclaimed any such challenge. To the dissent's assertion "that *Wheeler* is now ripe for review by our Supreme Court" (dis. opn., *post*, p. 342), we must profess some confusion. Certainly, review of *Wheeler* could not have been any riper than when review was actually sought in *Wheeler*, a review that was denied by our Supreme Court. (*Wheeler, supra*, at p. 1158.)

order may still be valid. We cannot determine the validity of this order from the evidence before us. Therefore, we reverse the order and remand the matter to the trial court for reconsideration of it in light of this opinion.[5]

## IV. DIRECTED VERDICT*

. . . . . . . . . . . . . . . . . . . . . . . .

## V. REMITTITUR

In case No. A056799, the judgments for Wagner and Bridgestone/Firestone are reversed. The cause is remanded to the trial court, which shall enter orders denying the motions for nonsuit as to the third cause of action for enterprise liability, but sustaining the motions as to all other causes of action. The demurrer shall not preclude Richie from going forward on the enterprise liability cause of action against Wagner. The judgment for Kaiser Gypsum is affirmed. In case No. A058407, the sanctions order is reversed and remanded to the trial court for reconsideration in light of this opinion. Wagner and Bridgestone/Firestone shall pay costs related to the appeal of the judgments, in an amount to be determined by the trial court on remand. The trial court shall also make an appropriate cost order once it determines whether or not to impose a new sanctions order. Richie shall pay those costs that the trial court finds attributable to the appeal of Kaiser Gypsum's judgment.

Poché, J., concurred.

ANDERSON, P. J., Concurring and Dissenting.—I concur with my colleagues' affirmance of the judgment entered after Kaiser Gypsum's directed verdict. However, I dissent from their reversal of the judgments entered in favor of Bridgestone/Firestone and Wagner. I respectfully suggest the trial court was correct in granting nonsuit on the third cause of action for enterprise liability. My dissent is not based on an analysis of whether or not *Wheeler* v. *Raybestos-Manhattan* (1992) 8 Cal.App.4th 1152 [11 Cal.Rptr.2d 109] (*Wheeler*) should be applied retroactively; rather, it is based on my firm belief that *Wheeler* itself was wrongly decided. My colleagues in the majority correctly observe that the parties herein do not challenge *Wheeler*, and *Wheeler* successfully withstood petition for review in our Supreme Court.

---

[5]In light of our reversal, we do not address other challenges to the sanctions order that Richie raises in her appeal.

*See footnote, *ante*, page 335.

However, the denial of review is not an expression by our Supreme Court of the correctness of *Wheeler*,[1] and I cannot in good conscience debate the retroactivity of an opinion wrongly decided, even if the parties do not take issue. *Wheeler* is not only contrary to all well-established authority, but it is not soundly reasoned. Liability for injury caused by exposure to asbestos brake products should not be subject to the market share theory announced in *Sindell* v. *Abbott Laboratories* (1980) 26 Cal.3d 588 [163 Cal.Rptr. 132, 607 P.2d 924] (*Sindell*). I respectfully urge that *Wheeler* is now ripe for review by our Supreme Court.

### *Wheeler Is Contrary to Precedent*

There is simply no rational basis for *Wheeler*'s ignoring this very court's decision in *Mullen* v. *Armstrong World Industries, Inc.* (1988) 200 Cal.App.3d 250, 257 [246 Cal.Rptr. 32] (*Mullen*) in which we "align[ed] California, the progenitor of the market share theory of liability, with the great majority of jurisdictions which have declined to extend it to the field of asbestos-related injuries." The "numerous inherent differences between DES and asbestos" (*id.* at p. 255) which we found in 1988 still existed in 1992, when my colleagues decided *Wheeler*. Earlier we recognized that diethylstilbesterol (DES) was produced by hundreds of companies pursuant to one formula and that all DES had "identical physical properties and chemical compositions" (*id.* at pp. 255-256) and created the same risk of harm to all pregnant women. In 1988 we observed that " 'Asbestos products, on the other hand, have widely divergent toxicities . . . .' " (*Id.* at p. 256.) We recognized then, but apparently not four years later, that " '. . . some asbestos products present[ed] a much greater risk of harm than others.' " (*Ibid.*) We found in 1988 that "This divergence is caused by a combination of factors, including: the specific type of asbestos fiber incorporated into the product; the physical properties of the product itself; *and the percentage of asbestos used in the product*." (*Ibid.*, italics added.) And we noted other differences in asbestos products, including the geographical origin of the mineral, the form in which the asbestos fibers are packed, and the concentration of asbestos fibers, citing *Celotex Corp.* v. *Copeland* (Fla. 1985) 471 So.2d 533, 537-538.

---

[1]This has been the law since our Courts of Appeal were created. In *People* v. *Davis* (1905) 147 Cal. 346 [81 P. 718] ". . . the Supreme Court flatly rejected the notion that its discretionary denial of a hearing, for undisclosed reasons, could be interpreted as a positive approval, and adoption of the point of law decided by the court of appeal." (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 776, p. 745.) The latest word on the subject, according to Witkin, comes from the advisory committee on revised rule 28: " 'Adoption of the new "review" procedure does not affect this legal doctrine, and denial of review will not be an expression of the opinion of the Supreme Court on the correctness of the judgment of the Court of Appeal or on the correctness of any discussion in the Court of Appeal opinion.' " (*Id.* at p. 747.)

In 1988 we characterized *Sindell* as involving "a group of 11 defendants all 'engaged in the business of manufacturing, promoting, and marketing' a single product 'produced . . . from an identical formula.' " (*Mullen, supra,* 200 Cal.App.3d at p. 256.) We contrasted asbestos as "a generic designation possessing a rainbow-like diversity and a bewildering array of potential uses." (*Ibid.,* fn. omitted.) We found in *Mullen* that ". . . plaintiffs are attacking an entire industry, not seeking recovery for damages caused by a single fungible product 'carr[y]ing with it a singular risk factor.' " (*Id.* at p. 257.)

Without distinguishing *Mullen,* and making only passing historical reference to it, *Wheeler* ignores its teaching and now finds asbestos, at least in brake pads, to be "fungible." *Wheeler* concedes that brake pads "are not manufactured from one single chemical formula like DES" (*Wheeler, supra,* 8 Cal.App.4th at p. 1156) and dismisses as "irrelevant, of course," the fact pads come in various sizes and shapes. *Wheeler* then boldly asserts, without any citation to evidence or authority, that "A single type of asbestos fiber, chrysotile, was used in all the pads, and the amount of asbestos by weight in the pads varied within a limited range." (*Ibid.*) Hence, brake pads are now "fungible." Interestingly, the *Mullen* court specifically found San Francisco General Order No. 21, which rejects application of *Sindell* to asbestos cases, "[e]qually worthy of mention" (*Mullen, supra,* 200 Cal.App.3d at p. 258, fn. 8)—the very order which *Wheeler* recognizes as based on "a variety of sound reasons" (*Wheeler, supra,* at p. 1155) and then finds "inapplicable" (*Id.* at p. 1158) to its facts.

Between 1988 and 1992 nothing changed. Asbestos was still as generic as before, general order No. 21 was concededly as "sound" as when adopted, and no new appellate decision or commentary had appeared. Indeed, *Wheeler* is devoid of both (1) citation to *any* authority in support of its holding and (2) any good reason for rejecting *Mullen* as controlling.

### *Wheeler Was Wrongly Decided*

*Wheeler*'s examination of our Supreme Court's decision in *Sindell, supra,* 26 Cal.3d 588 leads it to the following conclusion: "While brake pads are not absolutely interchangeable each for one another and hence are not fungible from the standpoint of an auto mechanic, they are fungible for the purposes of *Sindell* by virtue of containing roughly comparable quantities of the single asbestos fiber, chrysotile." (*Wheeler, supra,* 8 Cal.App.4th at p. 1156.) That conclusion finds no support either in the alleged facts or in law.

First, the *Wheeler* court bases its conclusion on "fungibility" on the erroneous assumption that brake shoes contain "roughly comparable quantities of . . . chrysotile." (*Wheeler, supra,* 8 Cal.App.4th at p. 1156.) The court distinguishes the case before it from an Ohio case (*Goldman* v. *Johns-Manville Sales Corp.* (1987) 33 Ohio St.3d 40 [514 N.E.2d 691]) in which the duct tape manufactured by the various defendants varied in asbestos content from 15 percent to 100 percent. The *Wheeler* court then makes the following fatal leap of faith: "In this case the asbestos content of the brake pads is not identical, but it varies in a much more restricted range. Therefore the risk of harm posed by the products of each manufacturer is more nearly equivalent." (*Wheeler, supra,* 8 Cal.App.4th at pp. 1156-1157.)

The so-called "restricted" range referenced by the *Wheeler* court is, in reality, quite *unrestricted. Wheeler* concedes that asbestos content in brake products ranges from 40 percent to 60 percent by weight. (*Wheeler, supra,* 8 Cal.App.4th at pp. 1156-1157.) Such a variance means asbestos content in brake shoes varies by as much as *50 percent* from one manufacturer to another—well within the 15 percent to 100 percent variance which caused the *Goldman* court to exclude applicability of the market share theory of liability. How can a variance of 50 percent between two products reasonably be classified as "a much more restricted range" than *Goldman*'s 15 percent to 100 percent (*id.* at pp. 1156-1157), let alone meet *Sindell*'s requirement of 0 percent variance?

Second, the *Wheeler* court notes but ultimately ignores two other key points raised by the defendants: (a) chrysotile fibers may come from various geographic sources; and (b) not all pads are (were) manufactured with the same bonding agents. (*Wheeler, supra,* 8 Cal.App.4th at p. 1156.) In *Mullen,* we noted that " '. . . it has been established that the geographical origin of the mineral can affect the substance's harmful effects. . . .' " (*Mullen, supra,* 200 Cal.App.3d at p. 256.) If that factor were significant in our analysis of fungibility with regard to asbestos-related injuries in general, it should certainly have influenced the *Wheeler* court's decision about fungibility where asbestos-containing brake pads are concerned. Just as importantly, the differences in bonding agents may well affect the amount of asbestos released over time—a factor which is very significant when the (*Wheeler*) plaintiffs were mechanics who allegedly worked on worn brakes over some undefined period of time.

In sum, I respectfully suggest that brake pads are *not* fungible within the meaning of *Sindell.* As such, the *Wheeler* court was wrong. To apply *Wheeler*

retroactively only compounds the error. I would affirm the judgments of the respected trial court in all particulars.

Respondents' petition for review by the Supreme Court was denied April 28, 1994. Lucas, C. J., was of the opinion that the petition should be granted.