[No. A093413. First Dist., Div. Four. Mar. 28, 2003.]

AUGUSTA FERRIS et al., Plaintiffs and Appellants, v.
GATKE CORPORATION, Defendant and Respondent.

**COUNSEL**

Alan Richard Brayton for Plaintiffs and Appellants.

Sedgwick, Detert, Moran & Arnold, Frederick D. Baker, Paul J. Riehl, Charles T. Sheldon, Katharine Demgen, Charles P. Murrin; Bennett, Samuelsen, Reynolds & Allard, Richard Reynolds, Frederick W. Gatt and Don Schaefer for Defendant and Respondent.

Gayle Irene Jenkins for Thelen, Reid & Priest as Amicus Curiae on behalf of Defendant and Respondent.

**OPINION**

**SEPULVEDA, J.**—Does *Sindell*'s burden-shifting "market share" theory of tort liability apply in litigation seeking recovery for personal injury and

wrongful death from inhalation of asbestos fibers? (*Sindell v. Abbott Laboratories* (1980) 26 Cal.3d 588 [163 Cal.Rptr. 132, 607 P.2d 924, 2 A.L.R.4th 1061] (*Sindell*).) As will appear, while the answer to that general proposition has been the subject of uncertainty, we conclude the circumstances presented by this record make it unnecessary for us to resolve the issue *vel non.* It is sufficient, we decide, that assuming *Sindell* relief may under some circumstances be available to plaintiffs in asbestos-related tort litigation, the record in this appeal fails to furnish the requisites necessary to establish that species of group tort liability. In light of that conclusion, we hold the superior court did not err here when it barred plaintiffs from pursuing *Sindell* relief at trial. For not unrelated reasons, we also conclude the trial court was correct when it granted a defense motion for nonsuit on plaintiffs' civil conspiracy claims. Given these dispositions, we will affirm the ensuing judgment for defendant from which this appeal is taken.

## FACTUAL AND PROCEDURAL BACKGROUND

Asserting he had been employed in naval shipyards and around other sources of asbestos exposure during his working life and regularly had replaced the friction brake shoes on his own and his neighbors' automobiles for close to 40 years, in December 1998, Harley Ferris and his wife Augusta filed suit for damages in tort against numerous manufacturers, suppliers, and distributors of asbestos, including manufacturers of friction brake products containing that mineral. The original complaint sought damages for personal injury and loss of consortium on theories of negligence, strict liability, fraud and deceit, and civil conspiracy. Not long thereafter, Mr. Ferris died from the effects of mesothelioma, an incurable pulmonary cancer associated with and thought to be caused by inhalation of asbestos particles. Joined by the Ferrises' two sons, Augusta pressed on with the lawsuit, amending the complaint to plead an additional cause of action for wrongful death.

The cause was called for trial on August 8, 2000. The defense filed an in limine motion to exclude evidence supporting a market share theory of liability, contending plaintiffs had not and could not establish that friction brake products containing asbestos were fungible, and had not and could not join defendants with a substantial share of the national friction products market. This motion was denied by the trial court without prejudice to its renewal following a hearing under Evidence Code section 402. Following such a hearing on August 22, 2000, defense motions in limine to exclude evidence supporting a theory of market share liability were renewed. At a hearing held on August 31, 2000, the trial court granted those motions. Somewhat later in the trial court proceedings, on September 7, 2000, the court granted the Gatke Corporation's motion for nonsuit on plaintiffs'

claims in negligence and strict products liability, as well as their civil conspiracy claims, founded on negligence and products liability. After judgment for defendant was entered on November 17, 2000, this timely appeal followed.

ANALYSIS

1. *On this record, the trial court did not err in barring plaintiffs from pursuing Sindell relief.*

In *Sindell, supra,* 26 Cal.3d 588, the plaintiff sought to impose tort liability on the defendant pharmaceutical manufacturers, alleging that while pregnant, her mother (along with thousands of other pregnant American women between 1941 and 1971) was given a synthetic compound of the female hormone estrogen known as diethylstilbestrol or DES, as a miscarriage preventative. (*Id.* at p. 593.) It was later determined that DES could cause cancerous vaginal and cervical growths in women exposed to it before birth by their mothers taking the drug during pregnancy. Judith Sindell eventually developed a bladder malignancy and related medical problems that, she asserted, were caused by her mother's ingestion of DES. Contending DES was produced from a common and mutually agreed upon formula "as a fungible drug interchangeable with other brands of the same product," and that the defendant manufacturers "collaborated in marketing, promoting and testing the drug, relied upon each other's tests, and adhered to an industry-wide safety standard," the plaintiff contended the defendant manufacturers were jointly and severally liable to her "because they acted in concert, on the basis of express and implied agreements, and in reliance upon and ratification and exploitation of each other's testing and marketing methods." (*Id.* at pp. 594-595.)

Although it rejected the plaintiff's group liability theories denominated "alternative liability," "concert of action," and "industry-wide" or "enterprise liability" (*Sindell, supra,* 26 Cal.3d 588, 598, 603), Justice Mosk's opinion for the majority crafted a burden-shifting approach requiring the defendant manufacturers to prove they did not produce the DES Ms. Sindell's mother had ingested, or be liable to the plaintiff in proportion to their shares of the DES national market. This novel theory of group liability—the so-called market share theory[1]—was derived by the *Sindell* court from another celebrated California Supreme Court decision,

---

[1]As others have noted, " '[d]escribing the theory of market share liability is much easier than defining it: [¶] "Under this doctrine, the traditional prerequisite of identifying the manufacturer of the injury-causing product is eliminated when the product is a generic item produced by several manufacturers. In such cases, plaintiffs need only allege inability to identify the actual manufacturer and join as defendants those manufacturers that compose a 'substantial share' of the market. . . . Th[e] theory shifts the burden of proof to each

*Summers v. Tice* (1948) 33 Cal.2d 80 [199 P.2d 1, 5 A.L.R.2d 91] (*Summers*). (*Sindell, supra,* 26 Cal.3d at p. 598.) In *Summers,* the court had held that a plaintiff, struck in the eye by birdshot when two hunters each negligently fired their shotguns in his direction, could recover damages from *either or both.* Despite the fact that only one of the defendant hunters could have fired the birdshot that struck the plaintiff, both were negligent wrongdoers and it would be unfair, Justice Carter reasoned for a unanimous court, to deprive the injured plaintiff of a remedy solely because it could not be determined *which* of the negligent defendants had fired the birdshot that actually *struck* him. (*Summers, supra,* 33 Cal.2d 80 at p. 86.) In these all-but-unique circumstances, the Supreme Court's *Summers* opinion dispensed with the requirement that a tort plaintiff must establish causation as a necessary condition to a defendant's liability.

Nearly a decade after *Sindell,* this court decided *Mullen, supra,* 200 Cal.App.3d 250. There, three homeowners filed a statewide class action suit against numerous manufacturers of asbestos products used in residential housing construction, alleging personal injury and property damage to their homes from both the use of such products and the cost of its removal. Alleging the asbestos products were " 'functionally interchangeable' " and that no testing procedures existed " 'to identify which defendant made a particular asbestos-containing product,' " the complaint sought to impose liability on the defendants under a *Sindell* market share theory. (*Id.* at p. 253.) General demurrers without leave to amend were sustained by the trial court; the plaintiffs appealed and this court affirmed.

"The briefest consideration," wrote Justice Poché, "demonstrates numerous inherent differences between DES and asbestos." (*Mullen, supra,* 200 Cal.App.3d at p. 255.) Quoting from a Florida Supreme Court decision, the *Mullen* court observed that " 'DES was produced by hundreds of companies *pursuant to one formula.* As a result, all DES had identical physical properties and chemical compositions and, consequently, all DES prescribed to pregnant women created the same risk of harm. . . . [¶] 'Asbestos products, on the other hand, have widely divergent toxicities . . . caused by a combination of factors, including: the specific type of asbestos fiber incorporated into the product; the physical properties of the product itself; and the percentage of asbestos used in the product. There are six different asbestos

---

manufacturer to prove its innocence . . . . [¶] If . . . plaintiff successfully establishes liability, damages are simply apportioned among defendants on the basis of each defendant's share of the product market. . . . A defendant can avoid liability only by proving that it did not produce the specific product that harmed the plaintiff." ' " (*Mullen v. Armstrong World Industries, Inc.* (1988) 200 Cal.App.3d 250, 255, fn. 6 [246 Cal.Rptr. 32] (*Mullen*), quoting *Hannon v. Waterman S.S. Corp.* (E.D.La. 1983) 567 F.Supp. 90, 91, fn. 1.)

silicates used in industrial applications and each presents a distinct degree of toxicity in accordance with the shape and aerodynamics of the individual fibers. Further, it has been established that the geographical origin of the mineral can affect the substance's harmful effects.' " (*Id.* at pp. 255-256, quoting *Celotex Corp. v. Copeland* (Fla. 1985) 471 So.2d 533, 537, 538, italics added by *Celotex Corp.*)

Unlike *Sindell*, where the Supreme Court "took pains to establish that it was dealing with 'fungible goods' . . . produced 'from an identical formula' " (*Mullen, supra,* 200 Cal.App.3d at p. 255), our *Mullen* opinion observed that asbestos "is a generic designation possessing a rainbow-like diversity and a bewildering array of potential uses. . . . Because 'asbestos is not a "product," but rather a generic name for a family of minerals' [citation] employed in a myriad of uses," the court reasoned, "the unavoidable conclusion is that plaintiffs are attacking an entire industry, not seeking . . . damages caused by a single fungible product 'carr[y]ing with it a singular risk factor.' In light of these circumstances, the prerequisite of fungibility has not been demonstrated. Plaintiffs have therefore failed to state a cause of action for market share liability." (*Id.* at pp. 256-257.) "We thus align California," the *Mullen* court concluded, "the progenitor of the market share theory of liability, with the great majority of jurisdictions which have declined to extend it to the field of asbestos-related injuries. [Citations.]" (*Id.* at p. 257.)

Four years after *Mullen* was decided, this court decided *Wheeler v. Raybestos-Manhattan* (1992) 8 Cal.App.4th 1152 [11 Cal.Rptr.2d 109] (*Wheeler*). There, five plaintiffs who had worked around and been exposed to asbestos dust from automotive friction brake products filed personal injury damages actions against three asbestos manufacturers in San Francisco Superior Court. As with all other asbestos personal injury litigation filed in San Francisco, the plaintiffs' consolidated actions were subject to that court's general order 21, providing "the theory of market share liability articulated in *Sindell* . . . is inapplicable to asbestos cases." (*Id.* at p. 1154.) After the trial court granted a defense motion for nonsuit, the plaintiffs appealed.

This court reversed and remanded. Noting that we had reached much the same conclusion in *Mullen* as the superior court had adopted in its general order 21 (*Wheeler, supra,* 8 Cal.App.4th at p. 1155), our opinion went on, however, to hold that the plaintiffs nevertheless should be permitted to attempt to establish the theory underlying their claim for *Sindell* relief. That theory was that friction "brake pads were fungible to the extent that a pad of

a given size, regardless of who made it, could be used on a variety of differentvehicles . . . . that the pads manufactured by defendants were all composed solely of chrysotile asbestos fiber [and] the brake pads all contained between 40 and 60 percent asbestos by weight." (*Id.* at p. 1156.) Because the plaintiffs alleged that a "single type of asbestos fiber, chrysotile, was used in all the pads, and the amount of asbestos by weight in the pads varied within a limited range," the *Wheeler* opinion reasoned, "they are fungible for the purposes of *Sindell* by virtue of containing roughly comparable quantities of the single asbestos fiber, chrysotile." (*Ibid.*) It followed, our opinion concluded, that "the peculiar facts presented by exposure to asbestos fiber from brake pads" made general order 21 "inapplicable to the facts of the claim stated by plaintiffs." The plaintiffs, *Wheeler* went on to point out, "have not proven the elements of a market share case; we hold only that they should be allowed to attempt it."[2] (*Wheeler*, at p. 1158.)

It is not difficult to appreciate the intellectual consistency between *Mullen* (holding that a market share theory of liability does not apply generally to asbestos litigation) and the exception carved out in *Wheeler* (holding that a *Sindell* theory of liability in asbestos litigation might be applicable under certain narrowly defined circumstances). The latter is simply a special subclass of asbestos cases held to be properly amenable to *Sindell* relief because of underlying factual analogies to the DES cases. It is, however, fair to ask how courts are to identify the line separating these two incommensurate paradigms. Some guidance regarding the application of *Sindell* principles in asbestos-related tort litigation is furnished by the high court's opinion in *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953 [67 Cal.Rptr.2d 16, 941 P.2d 1203] (*Rutherford*).

At issue before the *Rutherford* court was the validity of a local rule of the Solano County Superior Court purporting to "shift[] the burden of proof to defendants in asbestos cases tried on a products liability theory to prove that their products were *not* a legal cause of the plaintiff's injuries . . . ." (*Rutherford, supra,* 16 Cal.4th at p. 957), that is, a local court rule *opposite* to San Francisco's general order 21 at issue in *Wheeler*. (*Rutherford,* at p. 957, italics in original.) In assessing the validity of the contested local rule, the

---

[2]In *Richie v. Bridgestone/Firestone, Inc.* (1994) 22 Cal.App.4th 335 [27 Cal.Rptr.2d 418], a panel of this division gave *Wheeler* full retroactive effect, over a dissent by Presiding Justice Anderson, who attacked *Wheeler* itself as wrongly decided: "Between 1988 and 1992 nothing changed. Asbestos was still as generic as before, general order No. 21 was concededly as 'sound' as when adopted, and no new appellate decision or commentary had appeared. Indeed, *Wheeler* is devoid of both (1) citation to *any* authority in support of its holding and (2) any good reason for rejecting *Mullen* as controlling." (*Richie v. Bridgestone/Firestone, Inc., supra,* 22 Cal.App.4th at p. 343.)

California Supreme Court discussed at length the validity of a *Summers*-derived theory of tort liability and its burden-shifting approach in "asbestos-related latent personal injury actions brought against multiple suppliers of asbestos products." (*Id.* at p. 971.) The *Rutherford* court began its discussion by observing that "[t]he majority of courts have refused to extend the doctrine of alternative liability and its burden-shifting rule to asbestos-related latent personal injury actions brought against multiple suppliers of asbestos products. These cases have found the factors which support application of *Summers* alternative liability and burden shifting readily distinguishable from the facts typically involved in complex asbestos litigation." (*Ibid.*)

But the Supreme Court's *Rutherford* opinion does more than offer a series of observations concerning the judicial reception given *Sindell* in asbestos personal injury litigation in other American jurisdictions. It goes on to discuss, with evident approval, the reasons that prompted a great majority of reviewing courts across the nation to decline to apply burden-shifting market share principles in the context of asbestos exposure tort litigation. (*Rutherford, supra,* 16 Cal.4th at pp. 971-975.) Many of the courts that had rejected *Sindell*'s application to asbestos-related tort claims—from the Ohio Supreme Court (*Goldman v. Johns-Manville Sales Corp.* (1987) 33 Ohio St.3d 40 [514 N.E.2d 691]) to the federal district court for the Western District of Pennsylvania (*Vigiolto v. Johns-Manville Corp.* (W.D.Pa. 1986) 643 F.Supp. 1454)—did so on the ground that not all potential tortfeasors were joined as defendants (*Rutherford, supra,* 16 Cal.4th at p. 974).[3] The *Rutherford* court, however, divined a more fundamental reason for rejecting a burden-shifting approach to asbestos personal injury litigation—"the limits on the plaintiff's burden of proof on causation. . . ." (*Rutherford,* at p. 974.) This followed, the *Rutherford* court reasoned, because a plaintiff's burden of proving causation in such circumstances does *not* include a requirement of

---

[3]The high court's *Rutherford* opinion relies on a phalanx of judicial decisions from across the nation, overwhelmingly declining to apply a *Summers/Sindell*-based burden-shifting instruction to asbestos-related personal injury tort litigation. (*Rutherford, supra,* at pp. 971-973; see, e.g., *Black v. Abex Corp.* (1999) 1999 N.D. 236 [603 N.W.2d 182, 185]; *White v. Celotex Corp.* (9th Cir. 1990) 907 F.2d 104, 106; *Robertson v. Allied Signal, Inc.* (3d Cir. 1990) 914 F.2d 360, 380; *Leng v. Celotex Corp.* (1990) 196 Ill.App.3d 647 [143 Ill.Dec 533, 554 N.E.2d 468, 470-471]; *Gaulding v. Celotex Corp.* (Tex. 1989) 772 S.W.2d 66, 70-71; *Sholtis v. American Cyanamid Co.* (1989) 238 N.J.Super. 8 [568 A.2d 1196, 1203-1205]; *Case v. Fibreboard Corp.* (1987) 1987 Okla. 79 [743 P.2d 1062, 1064]; *In re Asbestos Litigation* (Del.Super.Ct. 1986) 509 A.2d 1116, 1118; *Blackston v. Shook & Fletcher Insulation Co.* (11th Cir. 1985) 764 F.2d 1480, 1483; *Celotex Corp. v. Copeland, supra,* 471 So.2d 533, 537-539; *In re Related Asbestos Cases* (N.D.Cal. 1982) 543 F.Supp. 1152; cf. *In the Matter of New York State Silicone Breast Implant Litigation* (1995) 166 Misc.2d 85 [631 N.Y.S.2d 491]; see also Prosser & Keeton on Torts (5th ed. 1984) § 103, at p. 714; but cf. *Menne v. Celotex Corp.* (10th Cir. 1988) 861 F.2d 1453, 1467.)

establishing "the scientifically unknown details of carcinogenesis, or . . . the unknowable path of a given asbestos fiber." (*Id.* at p. 976.)[4]

In the briefing before this court, respondent and supporting amicus curiae contend our *Wheeler* decision is no longer good law, having been disapproved, at least implicitly, by *Rutherford*'s analysis, if not by its precise holding. ■ Given this line of development and the current state of the case law, we consider the question whether this court is now in a position to draw any firm conclusions about *Wheeler*'s ongoing vitality. Only a modest one, we will conclude—that the exception approved by this court in *Wheeler* has no application to the factual record made in this case. We also reach the complementary conclusion that because we are not required to, we do not here decide the contemporary validity of *Wheeler* in circumstances in which it might properly be applicable. We reach these conclusions for the following reasons.

Significantly for present purposes, the *Rutherford* opinion observes that "[o]nly in one circumstance have we relieved toxic tort plaintiffs of the burden of showing exposure to the defendant's product: where hundreds of

[4]Two First District decisions, one filed before *Rutherford* and the other after, reach conclusions consistent with *Rutherford*. In *Lineaweaver v. Plant Insulation Co.* (1995) 31 Cal.App.4th 1409 [37 Cal.Rptr.2d 902] (*Lineaweaver*), a decision predating *Rutherford*, Division One of this court had before it a negligence case brought by three plaintiffs. In a bifurcated trial against a lone defendant—Plant Insulation Company—the jury returned liability and damages verdicts for the plaintiffs. The trial court granted nonsuit on the ground the plaintiffs had failed to establish exposure to the defendant's product, and appeals were taken. (*Id.* at p. 1413.) The *Lineaweaver* court affirmed, rejecting a *Sindell/Summers*-derived theory of group liability in the asbestos context. "Asbestos products have widely divergent toxicities," the court wrote. "Unlike the negligent hunters of *Summers*, all asbestos suppliers did not fire the same shot. Yet, under a burden-shifting rule, all suppliers would be treated as if they subjected plaintiff to a hazard identical to that posed by other asbestos products." (*Id.* at p. 1418.) And in a recent, post-*Rutherford* decision by a panel of this division—*McGonnell v. Kaiser Gypsum Co.* (2002) 98 Cal.App.4th 1098 [120 Cal.Rptr.2d 23] (*McGonnell*)—we succinctly acknowledged the changes wrought by *Rutherford*. At issue in *McGonnell* was the soundness of the trial court's order granting the defense summary judgment on the ground the plaintiffs had failed to prove exposure to the defendant's products. (*Id.* at p. 1102.) Affirming, we said this: "A threshold issue in asbestos litigation is exposure to the defendant's product. The plaintiff bears the burden of proof on this issue. (*Rutherford*[, *supra*,] 16 Cal.4th 953, 975-976 . . . ; *Lineaweaver v. Plant Insulation Co.*[, *supra*,] 31 Cal.App.4th 1409, 1415-1416 . . . .) If there has been no exposure, there is no causation. (*Dumin v. Owens-Corning Fiberglas Corp.* (1994) 28 Cal.App.4th 650, 655 [33 Cal.Rptr.2d 702].) Plaintiffs may prove causation in an asbestos case by demonstrating that the plaintiff's . . . exposure to the defendant's asbestos-containing product in reasonable medical probability was a substantial factor in contributing to the aggregate dose of asbestos the plaintiff . . . inhaled or ingested, and hence to the risk of developing asbestos-related cancer. (*Rutherford, supra*, at pp. 976-977.)" (*McGonnell, supra*, 98 Cal.App.4th at p. 1103.) In neither of these cases, nor in *Rutherford*, however, did we or the Supreme Court deal with asbestos exposure in the friction products context or discuss the *Wheeler* exception.

producers had made the same drug from an identical formula, practically precluding patients from *identifying the makers of the drugs* they took. (*Sindell, supra,* 26 Cal.3d at pp. 610-613.)" (*Rutherford, supra,* 16 Cal.4th at p. 976, italics added.) We think it is evident that supporting the application of *Sindell*'s group liability principles by this court in *Wheeler* was the singular fact alleged by the plaintiffs there—the asserted chemical homogeneity of the asbestos fibers composing friction brake products. Writing for this court in *Wheeler,* Justice Poché expressly said as much: "On the issue of fungibility plaintiffs offered to prove that the brake pads were fungible to the extent that a pad of a given size, regardless of who made it, could be used on a variety of different vehicles. Furthermore, they note that the pads manufactured by defendants were all composed solely of chrysotile asbestos fiber. Finally, the brake pads all contained between 40 and 60 percent asbestos by weight." (*Wheeler, supra,* 8 Cal.App.4th at p. 1156.)

Given this asserted compositional uniformity, the *Wheeler* plaintiffs' additional allegation that at the time of their exposure to friction asbestos dust "these worn brake pads could no longer be identified by brand"[5] (*Wheeler, supra,* 8 Cal.App.4th at p. 1155), was sufficient to bring the case within the liability principles approved by our Supreme Court in *Sindell* as the functional equivalent to the situation confronting the DES plaintiff. As the court explained, "[a] single type of asbestos fiber, chrysotile, was used in all the pads, and the amount of asbestos by weight in the pads varied within a limited range. While brake pads are not absolutely interchangeable each for one another and hence are not fungible from the standpoint of an auto mechanic, they are fungible for the purposes of *Sindell* by virtue of containing roughly comparable quantities of the single asbestos fiber, chrysotile." (*Id.* at p. 1156.)

Here, the pleadings indicate Mr. Ferris was exposed not only to asbestos dust from friction brake products while working on his and his neighbors' automobiles over the years, but also while working in West Coast naval shipyards in the six years spanning 1939 to 1945, and possibly while employed at San Quentin State Prison from 1960 to 1970, and as a furniture upholsterer from 1950 to 1960. The plaintiffs in *Wheeler* occupied a comparable situation, having been exposed to asbestos particles from both friction products and other, nonfriction sources. (*Wheeler, supra,* 8 Cal.App.4th at p. 1155.) The *Wheeler* plaintiffs, however, limited their request for *Sindell* relief to those manufacturers of friction brake products, eschewing that remedy with respect to the defendant nonfriction manufacturers. (*Ibid.*)

---

[5]This circumstance was the result, we gather, of the disappearance of the manufacturers' branding as the friction brake linings were worn away through use.

At oral argument of this cause, plaintiffs' counsel contended a like limitation on his clients' *Sindell* claim was sought in the trial court and that, while Judge Tomar Mason had never passed specifically on the applicability of the *Wheeler* "fungibility" exception to *Mullen,* the defense in limine motion was argued by both sides on the *assumption*—"as if"—plaintiffs' *Sindell* claim satisfied the "fungibilty" prong.[6] While we are unable to confirm that supposition from the record before us, as we explain, we think the point is academic in view of other flaws in plaintiffs' proof on the *Sindell* issue. Chief among these was the acknowledgement by plaintiffs' expert witness, Dr. Ben-Zion, that he was unable to compute Gatke's share of the national friction products market during the relevant time period.

Both at oral argument and in briefing, plaintiffs' counsel referred to the requirement of proof of an individual manufacturer's national market share as the "phantom fifth prong" for *Sindell* relief, suggesting such proof is not, as a matter of law, a requisite for establishing market share liability. We disagree. Indeed, it is plain both from Justice Mosk's opinion for the majority in *Sindell* and from the logic of the theory underlying market share tort liability itself that such proof is an essential predicate to relief. This is so because the very uniqueness of the remedy crafted by the court in *Sindell*—a modification of the alternative liability theory adopted by the court in *Summers*—was justified by the Supreme Court as mitigating what otherwise would be a manifest injustice.

"If plaintiff joins . . . the manufacturers of a substantial share of [the offending product], the injustice of shifting the burden of proof to defendants to demonstrate that they could not have made the substance which injured plaintiff is significantly diminished . . . . [¶] The presence in the action of a substantial share of the appropriate market also provides a ready means to apportion damages among the defendants. *Each defendant will be held liable for the proportion of the judgment represented by its share of that market* unless it demonstrates that it could not have made the product which caused plaintiff's injuries. . . . [¶] Under this approach, *each manufacturer's liability would approximate its responsibility for the injuries caused by its own products*. Some minor discrepancy in the correlation between market share and liability is inevitable; therefore, a defendant may be held liable for a somewhat different percentage of the damage than its share of the appropriate market would justify. . . . But just as a jury cannot be expected to determine the precise relationship between fault and liability in applying the doctrine of comparative fault [citation] or partial indemnity [citation] the difficulty of *apportioning damages among the defendant producers in exact*

---

[6]Indeed, defense counsel appears to have agreed the trial court reached its ruling on the *assumption* the *Wheeler* criteria for *Sindell* relief—including fungibility—were satisfied.

*relation to their market share* does not seriously militate against the rule we adopt." (*Sindell, supra,* 26 Cal.3d at pp. 612-613, italics added.)

In addition to this reasoning, the chief law review article on which the *Sindell* court relied in explicating the market share theory (see *Sindell, supra,* 26 Cal.3d at pp. 597, 611) also ties proportional tort liability to proof of an *individual* defendant's share of the market: Speaking of the DES cases, the comment in the Fordham Law Review reasoned that "Although joint liability may seem inequitable under these circumstances [i.e., mass tort cases presenting numerous defendants] it need not be. Since there is not an equal possibility of causation for each defendant, and the possibility of causation can best be estimated by market share, *damages should be apportioned according to market share.*" (Comment, *DES and a Proposed Theory of Enterprise Liability* (1978) 46 Fordham L.Rev. 963, 994, italics added.)

Coupled to that circumstance is the fact that Mr. Ferris *was* able to identify two of the manufacturers to whose friction asbestos brake products he was exposed and conceded he had no evidence substantiating exposure to any asbestos products manufactured by defendant Gatke. In answers to interrogatories propounded by defendant Gatke, plaintiffs stated that during the course of doing brake repair work on his and his neighbors' automobiles "[d]ecedent recalled RAYBESTOS and BENDIX brakes." It is, of course, precisely the *inability* of the plaintiffs in both *Summers* and *Sindell* to identify the causal source of their injuries that was said by our Supreme Court to justify reversing the usual burden of proving causation, allocating to the defendant tortfeasors the burden of negating their role in causing the plaintiff's injury.

The final consideration that weighs on us is one of legal policy. From *Sindell* onward courts confronting this unique group liability issue have underlined repeatedly the extraordinary departure from conventional tort law doctrine, with its Aristotelian conception of causation, such notions represent. The *Lineaweaver* court's opinion gives voice to one source of these concerns when it observes that "it is the wrongdoer who caused the harm that should bear the cost, and it serves no justice to fashion rules which allow responsible parties to escape liability while demanding others . . . compensate a loss they did not create." (*Lineaweaver, supra,* 31 Cal.App.4th at p. 1418.) We think a principle cognate to that recognition is that courts should employ such group liability concepts with great caution and only after being satisfied that the circumstances invoked in support of their application are truly compelling. Those criteria, we conclude, are not and cannot be met by plaintiffs in this case.

*2.  It was not error to grant defense motions for nonsuit on plaintiffs'
civil conspiracy claims.*

■  As noted at the outset (*ante*, at p. 1214), the trial court also granted
defendant Gatke's motion for nonsuit on plaintiffs' claims for negligence
and products liability, as well as their civil conspiracy claims based in
negligence and products liability. It did so on the express ground plaintiffs
had failed to establish a legal duty running from Gatke to Harley Ferris,
there being "no offer that there's evidence that the decedent actually used the
Gatke products." Plaintiffs attack that determination here as reversible error.

Deposition testimony by both of Mr. Ferris's sons, Jack and Gary, as well
as Augusta's deposition testimony, established that none could recall him
using friction brake products manufactured by Gatke. And in answers to
interrogatories propounded by the defense, plaintiffs were unable to offer
any testimony descriptive of the kinds of brake shoes Harley Ferris actually
used in working on his family's and neighbors' automobiles that might have
tied Gatke's products to Ferris.

Despite the absence of evidence supporting a reasonable inference that
Mr. Ferris was exposed to *defendant's* friction brake products, plaintiffs
contend the trial court erred reversibly in rejecting their civil conspiracy-
based causes of action for negligence, strict liability, fraud, and intentional
concealment. In oral argument before the trial court on September 1, 2000,
plaintiffs' counsel summarized the evidence they intended to rely on in
support of their civil conspiracy claims. Gatke, he contended, was a friction
brake pioneer "in the '30s, '40s and '50s," and "in the 1930s, they helped
sponsor a specific study with other companies of the hazards of asbestos
generally. They contributed, along with Raybestos Manhatt[a]n and Johns-
Manville and others" to scientific experiments with animals, exposing them
to asbestos and studying the effects at the Saranac Laboratory, a private
research facility near Saranac Lake, New York. "And in addition . . . ,"
counsel continued, "they formed a group called the Asbestos Textile Insti-
tute or the ATI . . . ." Among other things, plaintiffs argued, ATI con-
trolled the publication rights to the research results of the Saranac Labora-
tory investigation "so that it [i.e., the Saranac research results] could be
sanitized. In fact, it was sanitized" by removing all references to a link
between asbestos exposure and cancer. "Our evidence" counsel told the trial
court, "will prove that Gatke in concert with Raybestos Manhatt[a]n, Bendix
and other members [of the Institute] committed the tort of negligence [in]
manufacturing and sale of products that failed to perform as . . . an ordinary
consumer would expect. . . ." These were examples, according to counsel's
argument, "of tortious misconduct that Gatke will be shown to have done

pursuant to the common design and in concert with others like Raybestos Manhatt[a]n and Johns-Manville."

As indicated, the trial court granted defendant's motion for nonsuit on plaintiffs' civil conspiracy claims. For reasons explored in greater detail in our opinion in a companion appeal—*Chavers v. Gatke Corp.* (2003) 107 Cal.App.4th 606 [132 Cal.Rptr.2d 198]—also filed March 28, 2003—we hold the trial court's nonsuit ruling is supported by an unwavering line of California Supreme Court precedent. Beginning with *Gruenberg v. Aetna Ins. Co.* (1973) 9 Cal.3d 566 [108 Cal.Rptr. 480, 510 P.2d 1032], reaffirmed in *Doctors' Co. v. Superior Court* (1989) 49 Cal.3d 39 [260 Cal.Rptr. 183, 775 P.2d 508], and culminating (for now) in *Applied Equipment Corp. v. Litton Saudi Arabia, Ltd.* (1994) 7 Cal.4th 503 [28 Cal.Rptr.2d 475, 869 P.2d 454], the California high court has held repeatedly that, as a matter of law, a civil conspiracy to commit tortious acts can be formed only by parties already under a legal duty to the plaintiff, the breach of which will support an action in tort against the members of the conspiracy *individually*. Put another way, where a plaintiff asserts the existence of a civil conspiracy among the defendants to commit tortious acts, the source of any substantive liability arises out of an *independent* duty running to the plaintiff and its breach; tort liability cannot arise vicariously out of participation in the conspiracy itself. (*Chavers v. Gatke Corp., supra*, 107 Cal.App.4th at p. 614.) ▇▇▇ In light of these controlling principles, the trial court did not err in granting the motion for nonsuit.[7]

---

[7]Plaintiffs also contend the trial court erred by granting a defense motion for nonsuit without first affording their counsel an opportunity to make an opening statement. It is true the nonsuit statute—Code of Civil Procedure section 581c—contemplates a ruling on a motion for nonsuit "[o]nly after, and not before, the plaintiff has completed his . . . opening statement." (Code Civ. Proc., § 581c, subd. (a).) Here, however, *if* the trial court erred, it did so only at the invitation of plaintiffs' counsel. In preliminary proceedings on August 31, 2000, the trial judge and plaintiffs' and defendant's counsel discussed in open court the procedure to be followed in disposing of a defense in limine motion to exclude evidence supporting *Sindell* relief at the upcoming jury trial. As the discussion turned to the issue of the alleged conspiracy between defendant Gatke and other asbestos manufacturers, defense counsel suggested "the proper procedure is that [plaintiffs] make their offer of proof and that they stipulate that the nonsuit motion is made on that offer of proof." "All right," Judge Mason replied. "Then I believe all of those issues will be taken up properly tomorrow at 9:30. Is that agreeable?" While defense counsel indicated agreement with that statement, there was no response from plaintiffs' attorneys. On the following day, proceedings resumed. Although defendant contends counsel stipulated to this variant on the procedure prescribed by Code of Civil Procedure section 581c, subdivision (a), plaintiffs deny they stipulated. The record bears them out; there is no indication in the transcript that plaintiffs' counsel ever agreed expressly to substitute an offer of proof for the opening statement. Rather, plaintiffs' counsel was silent until *after* the trial court, evidently proceeding on the assumption the parties had stipulated, had ruled by granting the motion for nonsuit. Or, as Judge Mason stated to plaintiffs' counsel in response to his procedural objection to her ruling, "You put me in a difficult position

CONCLUSION

The judgment of the superior court is affirmed.

Kay, P. J., and Rivera, J., concurred.

Appellants' petition for review by the Supreme Court was denied July 9, 2003. George, C. J., and Brown, J., did not participate therein.

---

stating this particular objection now, since: Had this objection been stated before the court's ruling at the last hearing, I might have been able to accommodate your apparent request to have the ruling reserved until after opening statements . . . . And I assume that actually counsel preferred to know the Court's rulings so that no further time would be invested in the case if the Court found the Plaintiffs' offers insufficient." *Assuming* it was error to rule on the motion for nonsuit following an offer of proof rather than an opening statement, it was error invited by counsel's silent failure to timely bring any objection to the trial judge's attention before she had ruled. (Cf. *Weber, Lipshie & Co. v. Christian* (1997) 52 Cal.App.4th 645, 658 [60 Cal.Rptr.2d 677] [plaintiff estopped to urge error in choice of law on appeal where it consciously pursued contrary course in trial court]; see also *Giest v. Sequoia Ventures, Inc.* (2000) 83 Cal.App.4th 300, 302-303 [99 Cal.Rptr.2d 476] [use of stipulated offer of proof in lieu of opening statement]; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, §§ 383-385, pp. 434-436.)