Filed 7/20/23  Ochoa v. SPX Cooling Technologies CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| JO ANN OCHOA, et al.,<br><br>　　　Plaintiffs and Appellants,<br><br>v.<br><br>SPX COOLING TECHNOLOGIES, INC., et al.,<br><br>　　　Defendants and Respondents. | A164054<br><br>(Alameda County Super. Ct. No. RG20075699) |

Daniel Ochoa (Ochoa), a former HVAC technician and pipefitter, passed away after contracting mesothelioma.  He was married to plaintiff Jo Ann Ochoa and was the legal guardian of plaintiff Arianna Alyssa Huerta. Plaintiffs appeal from a summary judgment entered in favor of defendants Baltimore Aircoil Company (BAC), and SPX Cooling Technologies, Inc. (SPX),[1] manufacturers of HVAC cooling towers.  They maintain there are triable issues of fact as to whether Ochoa was exposed to asbestos while working on BAC and Marley cooling towers.  We affirm.[2]

---

[1] SPX is the successor-in-interest to Marley Cooling Tower Company (Marley), which was acquired by United Dominion Industries, Ltd. (UDI) in 1993.  SPX acquired UDI in 2001.

[2] Plaintiffs also appealed from the summary judgment entered in favor of Keenan Properties, Inc. (Keenan).  They filed a notice of settlement as to Keenan on May 26, 2022, but no request for dismissal has been filed in this

# BACKGROUND

*The Cooling Towers*

Cooling towers "cool water from an industrial process, either an air conditioning system or some other kind of industrial process, where heat rejection is required." Air enters through louvers on the outside of the towers. Hot water is sprayed out at the top of the tower over the "wet deck," which consists of stacked, corrugated material located on the inside of the towers. This cools the water, which is then collected in the bottom of the unit and recirculated.

Ochoa began working on cooling towers as an apprentice in the 1970's. He recalled working on BAC and Marley cooling towers, but for the most part was unable to identify which brand he worked on at a particular site. Ochoa did not "know whether any cooling tower that [he] worked on at any time in [his] career contained asbestos."

Ochoa's work involved cleaning and maintenance. He explained "if they called for us to go work on a cooling tower, we [had] to go and get it fixed, whatever it is. It [had] to be . . . [¶] . . . [¶] . . . repaired, fixed, cleaned, align belts, louvered, clean the louvers top and bottom, scrape it all off, all the particles on the towers, the [BAC] or the Marley Cooling Tower." Ochoa testified "[e]very time we had to work on a cooling tower you would have dust." After scraping the louvers of the cooling towers, he would "be breathing the product from these towers that . . . was, I guess, maybe fungus. It would be whatever is left on the towers[,] because of the chemicals they put in the water to keep the water as clean as possible." Wet "mud" would get on

_____

court. Plaintiffs have raised no issues regarding Keenan in their briefing on appeal.

his clothing, and he would let it dry before he scraped it off. The material came from both BAC and Marley cooling towers.

*BAC Cooling Towers*

BAC manufactured louvered cooling towers beginning in the 1960's and continuing through the 2000's. The louvers were made of galvanized steel until the 1980's and of fiberglass after that. BAC never manufactured cooling towers with louvers containing asbestos. It used galvanized steel for the outer casing of its towers, not asbestos-containing material. None of the fan bearings, fan blades, float valves or fan belts in BAC cooling towers contained asbestos.

Between 1973 to about 1979, BAC manufactured some cooling towers with asbestos in the "wet deck." The "wet deck" was located "entirely within the main compartment of the cooling tower" and was at least six inches from the towers' exterior casing and louvers. The louvers could be accessed "without making any contact with the . . . wet deck contained in the interior of the cooling tower." There were also "certain [BAC] cooling towers [that] utilized caulking and tape as sealants. The caulking and/or tape on some models may have contained asbestos."

Ochoa could not recall whether he had ever dismantled or accessed the interior of a BAC cooling tower. He would "work[] on these towers that need[ed] to be scraped, remove the water or clean the sump or change the belts, oil them, lin[e] the bearings, make sure the shafts are straight, didn't need to be replaced." He may have assisted in installing a new BAC tower, but identified only work done on the outside of the tower. Ochoa could not recall any specific location where he believed he had worked on a BAC tower.

BAC's "person most knowledgeable" submitted a declaration stating none of the work described by Ochoa on BAC towers "would involve any

3

asbestos containing component or the disruption of any asbestos-containing component to perform." The "scraping of the galvanized steel sides of a [BAC] cooling tower would not have resulted in the release of asbestos, and the material being scraped off the sides would have been a combination of calcium scale, particulate and biological matter pulled into the tower by the fan and/or accumulating in the recirculating water." Similarly, any material Ochoa would have cleaned "from the sump pan at the bottom of the cooling tower would have been a combination of organic and sedimentary in nature. . . . There would not be any measurable amount of asbestos found within the material being cleaned out of the [BAC] sump pan."

*Marley Cooling Towers*

Marley has manufactured and erected cooling towers since the mid-1930's. Prior to the early 1950's, it did not use asbestos-containing components in its cooling towers. In 1955, it "issued the first engineering specification authorizing the use of asbestos cement board ('ACB'), in its towers for use as casing, louvers and decking." Beginning in 1964, materials containing asbestos were also used in some "fill and . . . drift eliminators." In March 1986, Marley stopped manufacturing asbestos-containing cooling towers and stopped supplying asbestos-containing spare parts.

During the 1955–1986 time period, Marley also manufactured entirely asbestos-free cooling towers. The asbestos-free cooling towers had casing, louvers and fan decks composed of wood, glass-reinforced plastic, aluminum, or steel. The asbestos-free drift eliminators and fill were made of "wood, neoprene-coated non-asbestos containing kraft paper and/or plastic ('PVC')."

When working on the Marley towers, Ochoa testified he would "clean them, maintain them, set the valves that need to be replaced, replace them, oil the bearings, replace bearings . . . [s]ometimes . . . the shaft will have to be

4

removed completely, rebuilt to accept the new fan belt, towers, whatever had to be replaced with the shaft that was attached to it." To clean the cooling towers, Ochoa would scrape the louvers with a large putty knife on a long pole, power wash the tower's fill, and clean mud out of the cooling tower's sump pan at the bottom of the tower with a vacuum and putty knife. Ochoa testified the material he scraped off the louvers was "maybe fungus" or "mud, bacteria, whatever."

*Work Sites*

Ochoa identified the Huntington Library as a site where he worked on steam lines and "[p]ackage units, towers."[3] SPX produced records showing a Marley cooling tower had been shipped to that site in 1956. The work Ochoa described at that site was all related to the package units and the steam lines.

Ochoa also testified he worked on Marley and BAC cooling towers during his time at WeatherRight, doing mechanical and cleaning maintenance. On the Marley cooling towers, Ochoa replaced valves, oiled bearings, replaced bearings, removed shafts for rebuilding, and possibly installed a new fan belt.

*The Summary Judgment Motion*

Defendants moved for summary judgment on the ground there was no evidence Ochoa was exposed to asbestos from their products as a result of his work. The trial court granted the motion and entered judgment accordingly.

As to SPX, the trial court stated "Plaintiffs have not shown that they have or can reasonably obtain evidence to show that [Ochoa] was exposed to

---

[3] Ochoa described package units as "like if you have a box, and everything is in . . . that box to function correctly. . . . A package unit is like if you have one room and you want to keep that room at a certain temperature, that's a package unit that controls that room only."

5

asbestos-containing components on Marley cooling towers that he worked on. Nor is there evidence on this record that the type of work [Ochoa] performed would have inevitably caused him to be in contact with and exposed to asbestos dust from asbestos-containing components that might have been on Marley cooling towers that he worked on."

As to BAC, the trial court stated "while Plaintiffs have evidence that [Ochoa] worked on BAC cooling towers and that some BAC cooling towers had asbestos-containing components, Plaintiffs have not explained or provided evidence showing that the work [Ochoa] performed on BAC cooling towers would have exposed him to asbestos. Plaintiffs have not shown how the maintenance, cleaning or repair described by [Ochoa] would have exposed him to asbestos from the fill, or that his work involved working on any asbestos-containing caulk or tape. As such, Plaintiffs have not raised a triable issue of facts as to threshold exposure on this record."

## DISCUSSION

" 'On an appeal from an order granting summary judgment, we independently examine the record to determine whether there are any triable issues of material fact. [Citation.] In performing our review, we view the evidence in the light most favorable to plaintiffs as the losing parties, resolving any evidentiary doubts or ambiguities in their favor.' (*McGonnell v. Kaiser Gypsum Co.* (2002) 98 Cal.App.4th 1098, 1102 . . . (*McGonnell*).)" (*Shiffer v. CBS Corp.* (2015) 240 Cal.App.4th 246, 251 (*Shiffer*).)

"In the context of a cause of action for asbestos-related latent injuries, the plaintiff must first establish some threshold exposure to the defendant's defective asbestos-containing products, and must further establish in reasonable medical probability that a particular exposure or series of exposures was a 'legal cause' of his injury, i.e., a substantial factor in

6

bringing about the injury." (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 982, fn. & italics omitted (*Rutherford*).)

Plaintiffs bear the burden of " ' "demonstrating that exposure to . . . asbestos products was, in reasonable medical probability, a substantial factor in causing or contributing to [the] risk of developing cancer." (*Rutherford*[, *supra,*] 16 Cal.4th [at pp.] 957–958. . . .) . . . "[Plaintiffs] cannot prevail . . . without evidence [of exposure] to asbestos-containing materials manufactured or furnished by [a defendant] with enough frequency and regularity as to show a reasonable medical probability that this exposure was a factor in causing the plaintiff's injuries." [Citations.] "While there are many possible causes of any injury, ' "[a] possible cause only becomes 'probable' when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action." ' " ' " (*Shiffer, supra,* 240 Cal.App.4th at p. 251.)

Defendants, as the parties moving for summary judgment, had the burden of showing that one or more elements of the plaintiffs' causes of action could not be established. (Code Civ. Proc., § 437c, subd. (o)(1); *McGonnell, supra*, 98 Cal.App.4th at pp. 1102–1103.) The " 'party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if [it] carries [its] burden of production, [it] causes a shift, and the opposing party is then subjected to a burden of production of [its] own to make a prima facie showing of the existence of a triable issue of material fact.' [Citation.] Circumstantial evidence supporting a defendant's summary judgment motion 'can consist of "factually devoid" discovery responses from which an absence of evidence can be inferred,' but 'the burden should not shift without

7

stringent review of the direct, circumstantial and inferential evidence.' " (*Andrews v. Foster Wheeler LLC* (2006) 138 Cal.App.4th 96, 101.)

Plaintiffs maintain defendants did not meet their initial burden, asserting their discovery responses were not factually devoid of evidence of Ochoa's exposure to asbestos in defendants' products.

Ochoa testified at his deposition he did not know if *any* cooling tower he worked on contained asbestos.[4]  Although he remembered working on both BAC and Marley cooling towers, he was generally unable to identify which brand of tower he worked on at a particular jobsite.  He explained cooling towers "are practically all made the same, whether it's Baltimore Cooling Tower or Marley.  They all look alike, you know."

Ochoa testified he worked on BAC cooling towers scraping the louvers, cleaning the sump pan, changing and oiling the belts, lining the bearings, and making sure the shafts were straight.  He may have assisted in installing a new BAC tower, but only identified work done on the outside of the tower. Neither Ochoa nor plaintiffs produced any evidence there was asbestos in the parts of the BAC towers on which Ochoa worked, or any evidence that the work about which he testified on the towers "involve[d] any asbestos[-]containing component or the disruption of any asbestos-containing component. . . ."  Although Ochoa testified his work scraping louvers on the cooling towers produced dust, neither he nor plaintiffs produced any evidence it was asbestos dust.

Moreover, BAC presented affirmative evidence that none of the work to which Ochoa testified would have resulted in his exposure to asbestos.  This

---

[4]  Generally, "[s]tatements made in a deposition govern and prevail over contrary declarations."  (*Turley v. Familian Corp.* (2017) 18 Cal.App.5th 969, 976 (*Turley*).)

8

was principally provided by the declaration of David Hutton, its "person most knowledgeable," as well as his "further declaration" submitted by BAC with its reply brief "to assist the Court with better understanding of two key components of a cooling tower: namely the louvers and the MNA wet-deck." (Capitalization & underscoring omitted.) Plaintiffs objected that Hutton's second declaration was "inappropriate for consideration," citing *San Diego Watercrafts, Inc. v. Wells Fargo Bank* (2002) 102 Cal.App.4th 308, 316. That case recognized "[w]hether to consider evidence not referenced in the moving party's separate statement rests with the sound discretion of the trial court, and we review the decision to consider or not consider this evidence for an abuse of that discretion." (*Ibid*.) Because BAC submitted this declaration "to fill gaps in the original evidence created by the opposition," plaintiffs have not demonstrated the trial court abused its discretion in overruling their objection and considering the declaration. (*Los Angeles Unified School Dist. v. Torres Construction Corp.* (2020) 57 Cal.App.5th 480, 499.)[5]

---

[5] At oral argument, counsel advanced a new argument as to why the trial court assertedly abused its discretion in allowing the Hutton declaration—because Hutton had been deposed as BAC's person most knowledgeable but had prepared the declaration not as a person most knowledgeable but as an individual with personal knowledge about the construction and operation of BAC the cooling towers. According to counsel, this infringed plaintiffs' "due process" rights because they never had the opportunity to depose Hutton as an individual with personal knowledge. However, plaintiffs forfeited this contention by failing to make it below or in their opening brief. " ' "[D]efendant's failure to make a timely and specific objection" on the ground asserted on appeal makes that ground not cognizable.' " (*People v. Valdez* (2012) 55 Cal.4th 82, 130; see *People v. Carter* (2003) 30 Cal.4th 1166, 1201 ["Because defendant objected at trial . . . to the question . . . only on relevancy grounds, he forfeited the constitutional claims he now seeks to raise."].)

9

Ochoa also testified he "probably" worked on a BAC cooling tower during his time at LA Trade Tech and WeatherRight, doing mechanical and cleaning maintenance. He replaced valves, oiled bearings, replaced bearings, removed shafts for rebuilding, and possibly installed a new fan belt. But neither he nor plaintiffs produced any evidence those parts contained asbestos or that he was exposed to asbestos while working on those parts.

At oral argument, plaintiffs' counsel focused on a health and safety study by BAC in the 1970's that showed asbestos fibers were released in "the breathing zones of the workers." Counsel asserted this permitted an "inference" that Ochoa was exposed to asbestos. However, Hutton's uncontradicted deposition testimony explained this particular study was done at the BAC manufacturing facility, not at any post-manufacturing installation site, let alone a site where Ochoa worked. Furthermore, although plaintiffs had a full opportunity to question Hutton about the sources of the detected fibers reported in the manufacturing plant study, they asked no such questions. Accordingly, the record contains no evidence even as to the source of the fibers detected at the manufacturing plant.

As to Marley, neither Ochoa nor plaintiffs produced any evidence he worked on any Marley tower with asbestos-containing parts. Although some Marley towers during the relevant time period had asbestos-containing parts, other Marley towers were asbestos-free.

SPX records showed a Marley cooling tower had been shipped in 1956 to the Huntington Library in San Marino, a worksite Ochoa identified. But he further testified only about work on "steam lines" and "package unit[s]," not on a cooling tower at that site. Moreover, he testified the louvers on the cooling towers which he recalled scraping, and the fill he recalled washing, were made of metal or wood. Again, neither Ochoa nor plaintiffs produced

10

any evidence those parts contained asbestos, or that the work Ochoa did on those cooling towers would result in contact with asbestos.

The court in *Casey v. Perini Corp*. (2012) 206 Cal.App.4th 1222, considered similarly deficient discovery responses. In that case, the plaintiff "admitted that he did not know what materials contained asbestos and what materials did not. Rather, he assumed there was 'probably asbestos in whatever they were cleaning up.' He was unable to recall the name of any products used at the jobsites. [Plaintiff's] deposition made clear that he had no knowledge about whether any of the products that others used or disturbed in his presence contained asbestos. Specifically, he was unable to give a definitive answer when asked if he had any information or knowledge that he was exposed to asbestos through the activities or inaction of [defendant].' " (*Id*. at p. 1229.) The responses "d[id] not state specific facts showing that [he] was actually exposed to asbestos and/or asbestos-containing products due to [defendants'] activities. Rather, [his] answer[s] assume[d], without any evidentiary support, that the dust and debris allegedly disturbed . . . contained asbestos." (*Id*. at p. 1230, italics omitted.) Thus, "[Defendant] met its initial burden of presenting evidence sufficient to make a prima facie case showing that triable issues of fact did not exist regarding causation. [Citation.] Therefore, the burden shifted to plaintiffs to establish a triable issue of fact regarding causation." (*Id*. at p. 1231.)

Similarly in *McGonnell*, the plaintiff brought an action based on alleged exposure to asbestos-containing products while working at California Pacific, naming numerous defendants including Kaiser Gypsum and Kaiser Cement. (*McGonnell*, *supra*, 98 Cal.App.4th at p. 1100.) Plaintiff's deposition testimony "showed [he] would cut into walls and disturb building materials . . . [but there was] little evidence that [plaintiff] disturbed Kaiser products,

11

and virtually no evidence he had disturbed Kaiser products containing asbestos." (*Id*. at p. 1104.) Plaintiff's evidence "suggest[ed] that Kaiser Cement products might have been used once on a construction project at California Pacific. There is no evidence, however, that these products contained asbestos at the time of their use. Deposition excerpts from a contractor and building materials supplier showed Kaiser Cement plastic (stucco) cement might have been delivered for use on a project at California Pacific in the late 1970's. . . . [A]s defendants point[ed] out, plastic cement is applied to exterior walls for a stucco finish, and there was no evidence [plaintiff] worked with or around stucco." (*Id*. at p. 1105.)

The *McGonnell* court concluded "It is not enough to produce just some evidence. The evidence must be of sufficient quality to allow the trier of fact to find the underlying fact in favor of the party opposing the motion for summary judgment. [Citation.] All that exists in this case is speculation that at some time [plaintiff] might have cut into a wall that might have contained Kaiser joint compound that might have contained asbestos. The evidence creates only 'a dwindling stream of probabilities that narrow into conjecture.' " (*McGonnell*, *supra*, 98 Cal.App.4th at p. 1105.)

Similarly in this case, Ochoa did not testify he worked on any cooling towers that contained asbestos. As to the BAC towers, although there was evidence they contained certain asbestos-containing parts, the louvers and outer casings of the towers did not, and the work to which Ochoa testified would not have exposed him to asbestos. As to the Marley cooling towers, some contained asbestos components. But Ochoa testified he cleaned the louvers of the towers, and neither he nor defendants produced any evidence the louvers contained asbestos and cleaning would release asbestos dust.

12

Indeed, he testified the louvers were made of "metal or wood" and the material he scraped off was "maybe fungus" and mud.

Relying on *Ganoe v. Metalclad Insulation Corp.* (2014) 227 Cal.App.4th 1577 (*Ganoe*) and *Turley, supra,* 18 Cal.App.5th 969, plaintiffs claim they did submit sufficient evidence of Ochoa's exposure to defendants' asbestos-containing products to raise a triable issue. Both cases are distinguishable.

In *Turley*, the plaintiff alleged he was exposed to defendant's asbestos-containing pipe products at three locations during his career. (*Turley*, *supra*, 18 Cal.App.5th at pp. 971–972.) He also identified individuals with knowledge of this exposure, including his co-worker, Scott. (*Id*. at pp. 972, 973–974.) Scott submitted a declaration stating he worked with plaintiff for about six years, that he was the person responsible for ordering and distributing materials, and that " 'when those products came in, . . . the packing slip, it listed the material, what it was. It also had the vendor name on it and [defendant's] name was on those packing slips.' " (*Id*. at pp. 974–975.) On " 'many occasions' the replacement gaskets that [plaintiff] was exposed to while working . . . were asbestos-containing-and supplied by [defendant]." (*Id*. at p. 974.) The plaintiff also submitted "specific portions of Scott's deposition" that " 'affirmed the statements in his declaration. . . ." (*Id*. at p. 975.) Scott further testified he had seen the plaintiff " 'pull a gasket,' " and observed him " 'in close proximity to different mechanics while working on these gaskets.' " (*Ibid*.)

The Court of Appeal reversed the summary judgment in favor of the defendant, stating "Scott's testimony established that [defendant]-supplied asbestos-containing gaskets were frequently used at [plaintiff's] worksite throughout the five years that Scott was the person ordering, procuring, and distributing such products to the sites—and that [plaintiff] used them."

13

(*Turley*, *supra*, 18 Cal.App.5th at p. 981.) The record here is not remotely comparable.

In *Ganoe,* the plaintiff contracted mesothelioma after working in a Goodyear Tire & Rubber Company plant from 1968–1979. (*Ganoe*, *supra*, 227 Cal.App.4th at p. 1579.) His initial discovery responses did not identify defendant Metalclad Insulation Corp. as a supplier. His "sole product identification witness" had " 'never heard of' Metalclad," and Metalclad's "person most knowledgeable" submitted a declaration stating " 'Metalclad has no information, documents to suggest, or knowledge of having ever performed any work or supplied materials to be used at [Goodyear]." (*Ibid.*) However, after Metalclad filed its motion for summary judgment, it produced a newly discovered document showing it had "performed insulation work on steam piping at the Goodyear plant in 1974." (*Id.* at pp. 1579–1580.) Thereafter, the plaintiff served amended discovery responses identifying a new machine installed at Goodyear in 1974 "which required 'new steam pipes [] to be installed and insulated as well as tied into the existing insulated piping and machinery' " and the " 'removal of old insulation released in the air asbestos-containing dust that . . . [plaintiff] breathed.' " (*Id.* at p. 1580.) The amended responses also stated the only work involving insulation performed in 1974 at the plant was " 'the work associated with the installation of the new Banbury and lay-down machines and associated piping' " and Metalclad "performed insulation work on steam piping in 1974 at the Goodyear plant." (*Ibid.*) The trial court granted summary judgment, ruling the belatedly produced document "did not show that [Metalclad] had performed work in the vicinity of [plaintiff] as it did not identify 'specific dates when, and locations within the plant where, the work occurred.' " (*Id.* at p. 1581.) Although a co-worker

14

"saw 'outside contractors' perform insulation work," the worker "did not identify Metalclad as one of those contractors." (*Ibid*.)

The Court of Appeal reversed, concluding Metalclad had not met its burden. (*Ganoe, supra*, 227 Cal.App.4th at p. 1582.) The court first observed it was "unclear whether the trial court considered plaintiff's amended response to Metalclad's discovery when it made [its] determination," and "[i]t would be inequitable to allow a moving party to withhold relevant discovery and then meet its burden on summary judgment without consideration of such newly discovered evidence or the opposing party's response to that evidence." (*Id*. at pp. 1582–1583.) The court further observed that, assuming the trial court properly considered the plaintiff's amended discovery responses, this discovery contained specific facts showing Metalclad had exposed plaintiff to asbestos. (*Id*. at p. 1584.) Thus, the evidence "present[ed] more than mere speculation of causation"—"there was evidence Metalclad performed insulation work on steam piping at the Goodyear plant in 1974, that the only construction work requiring the installation of insulation at the Goodyear plant in 1974 occurred in Department 132 when a new Banbury machine and 'lay-down machine' were installed, that the installation of those machines also required the removal of old insulation, and that [plaintiff] worked in that department, was present during the repair of the steam lines' insulation and breathed in the resulting dust. Furthermore, according to plaintiff's expert, it was more likely than not that the old insulation removed during this process contained asbestos. Viewed in its best light, this evidence supported a reasonable inference that plaintiffs could show causation." (*Id*. at p. 1586, fn. omitted.) Again, the record in the instant case is not comparable.

Indeed, plaintiffs acknowledge their lack of production of evidence as to which brand of cooling tower Ochoa worked on at specific sites and whether those cooling towers contained asbestos. But they claim, without legal citation, this is only relevant to "credibility and apportionment." However, without the threshold evidence of exposure, there is nothing to apportion. Plaintiffs have not alleged market share liability,[6] and they do not explain how Ochoa's inability to identify the manufacturers of the towers on which he worked or whether they contained asbestos is relevant only to credibility.

In sum, there must be more than some evidence that plaintiff worked on some cooling tower that might have contained an asbestos-containing part, without any evidence of asbestos exposure. But that is all the record evidence shows here.

## DISPOSITION

The judgment is affirmed. Costs on appeal to respondents.

---

[6] " ' " 'Under this doctrine, the traditional prerequisite of identifying the manufacturer of the injury-causing product is eliminated when the product is a generic item produced by several manufacturers. In such cases, plaintiffs need only allege inability to identify the actual manufacturer and join as defendants those manufacturers that compose a "substantial share" of the market. . . . Th[e] theory shifts the burden of proof to each manufacturer to prove its innocence. . . . [¶] If . . . plaintiff successfully establishes liability, damages are simply apportioned among defendants on the basis of each defendant's share of the product market. . . . A defendant can avoid liability only by proving that it did not produce the specific product that harmed the plaintiff.' " ' " (*Ferris v. Gatke Corp*. (2003) 107 Cal.App.4th 1211, 1215, fn. 1.)

16

_____  Banke, J.

We concur:


_____
Humes, P.J.


_____
Bowen, J.*


**Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


A164054, Ochoa et al. v. SPX Cooling Technologies et al.


17